Alberto MARTINEZ, Appellant,

v.

The STATE of Texas, State.

No. 2–06–088–CR.

Court of Appeals of Texas, Fort Worth.

July 19, 2007.

Rehearing Overruled Aug. 31, 2007.

Discretionary Review Dismissed Dec. 5, 2007.

Ruben Gonzalez, Fort Worth, for Appellant.

Tim Curry, Crim. Dist. Atty., Charles M. Mallin, Kimberly Colliet Wesley, Walt Junker, Asst. Dist. Atty's, Fort Worth, for State.

Panel B: LIVINGSTON, WALKER, and McCOY, JJ.

## OPINION

TERRIE LIVINGSTON, Justice.

### I. Introduction

Appellant Alberto Martinez appeals his conviction and twenty-five-year sentence for possessing 400 grams or more of methamphetamine, including adulterants and dilutants, with intent to deliver. In two issues, appellant complains that the trial court erred by denying his motion to suppress evidence obtained from an illegally prolonged stop and search and by admitting a statement from appellant's juvenile son in violation of appellant's confrontation rights. We affirm.

### II. Background Facts

A confidential informant told Fort Worth Police Department officers that appellant had a large cache of methamphetamine ice in his home. On April 18, 2005, narcotics investigators set up surveillance at the home and arranged for the informant to use a middleman to order a pound of methamphetamine ice from someone at the home. After the informant contacted the middleman to order the methamphetamine, the officers saw appellant walk outside with a brown paper sack containing a heavy object. Appellant placed the brown sack in the rear floorboard of an Oldsmobile and then got into the driver's seat. Another man got into the front passenger's seat, and appellant's teenage son, C.D., got into the rear driver's side passenger seat.

Detective Eric Martinez, one of the narcotics officers, attempted to follow appellant as he drove away but lost sight of the Oldsmobile on Interstate 35. Detective Bruce Blaisdell, who was following appellant in a different vehicle, saw appellant change lanes without using a turn signal and noticed that none of the passengers were wearing their seatbelts. Later, when

Officer Nathan Holsey spotted the Oldsmobile, Detective Blaisdell ordered him to stop the car based on the observed traffic violations. Instead of pulling over immediately after Officer Holsey turned on his lights and sirens, appellant continued to drive for several blocks.

At the same time that Officer Holsey was trying to stop appellant on the interstate, officers at appellant's home saw a Ford Explorer in the driveway. One officer saw an individual place what appeared to be a cooler in the back of the Explorer and then drive down the street and pick up a person who was standing on the street and talking on a cell phone. The officers later determined that appellant had a cell phone in his shirt pocket, and they believed that appellant had called someone at the house.

When appellant pulled over to the shoulder of the road, Officer Holsey approached and asked for his driver's license and proof of insurance. Appellant possessed neither, so Officer Holsey arrested him, conducted a pat down search, and placed him in the back seat of the patrol car. Officer Holsey found no weapons or drugs.

Meanwhile, several other police officers, including Detectives Martinez and Blaisdell, had parked their vehicles on the access road below the interstate; Detective Martinez began walking up the concrete ramp between his car and the Oldsmobile approximately two to three minutes after appellant pulled over. Detective Martinez saw Officer Holsey return to the Oldsmobile and ask C.D. and the other adult male passenger to step out. Officer Holsey first frisked C.D.; C.D. stepped out of the Oldsmobile, walked to the trunk, bent over, and placed his hands on the trunk. Officer Holsey, who faced C.D.'s back the entire time, conducted a quick frisk for cell phones and weapons. Finding no cell phones or weapons on C.D. or the other adult male passenger, Officer Holsey instructed them to stand by a guardrail near the Oldsmobile. Although Officer Holsey had faced C.D.'s back throughout the entire frisk, Detective Martinez, who was still walking up the service ramp, faced C.D.'s front and noticed a suspicious bulge in C.D.'s waistband. Fearing the bulge might be a weapon, Detective Martinez immediately approached C.D. at the guardrail and asked him what was in his pants. C.D., who was not under arrest or handcuffed, started crying and said that he did not know what it was but that appellant had given it to him to hide. Detective Martinez asked C.D. to remove the item in his pants; C.D. pulled out a clear plastic bag.

Officers later determined that the plastic bag contained more than 440 grams of methamphetamine ice. As a result, Detective Martinez arrested appellant and C.D. At the same time that Detective Martinez approached C.D. and found the drugs, other plainclothes officers approached the scene, questioned appellant, and searched the car, where they found no further evidence of drugs.[1] Detective Martinez told an officer to detain C.D. and then walked over to question appellant. Appellant consented to a search of his residence, which produced no drugs.

Appellant's bench trial began on March 2, 2006, and lasted three days.[2] The trial

1. When the officers questioned appellant about the other adult male passenger, appellant told them that he was "just a guy I live with." Based on this information, the officers decided not to put the man's name in their report or interview him. Consequently, the record is unclear regarding who the other adult male passenger was and to what extent he may have been involved with the methamphetamine ice.

2. Appellant waived his right to a jury trial.

court denied appellant's motion to suppress evidence obtained from the stop and search and overruled appellant's objections to testimony regarding C.D.'s statements during the arrest. After making findings of fact and conclusions of law on the record, the trial court found appellant guilty of intentionally or knowingly possessing methamphetamine of more than 400 grams with intent to deliver and sentenced him to twenty-five years' incarceration.

### III. The Stop and Search

In his first issue, appellant argues that the trial court erred by denying his motion to suppress because the stop and search occurred over an "illegally extended" period of time "beyond the scope and justification for the charges related to the initial stop"; thus, the officers obtained evidence they should not have obtained. According to appellant, because the stop and search violated his Fourth Amendment right against illegal searches and seizures, the drugs and C.D.'s statements should have been suppressed.[3]

### A. Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim.App.2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex.Crim.

App.1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex.App.-Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim.App.2000); *State v. Ballard*, 987 S.W.2d 889, 891 (Tex.Crim.App.1999). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex.Crim.App.2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex.Crim.App.2002); *State v. Ballman*, 157 S.W.3d 65, 68 (Tex.App.-Fort Worth 2004, pet. ref'd). But when the trial court's rulings do not turn on the credibility and demeanor of the witnesses, we review de novo a trial court's rulings on mixed questions of law and fact. *Estrada v. State*, 154 S.W.3d 604, 607 (Tex.Crim. App.2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex.Crim.App.2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the

**3.** In his brief, appellant initially claims that the officers violated his rights under the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution and his rights under article I, section 10 of the Texas Constitution. However, appellant's legal and factual analyses focus exclusively on the alleged Fourth Amendment violation. When briefing constitutional issues, a party should separate federal and state issues into distinct points or issues and provide substantive argument on

each. *McCambridge v. State*, 712 S.W.2d 499, 501 n. 9 (Tex.Crim.App.1986). If a party does not do this, we need not address federal and state constitutional issues separately. *Eldridge v. State*, 940 S.W.2d 646, 650 (Tex. Crim.App.1996). Because appellant failed to provide substantive arguments for each constitutional claim, our analysis of his Fourth Amendment complaint will dispose of all constitutional claims.

trial court's ruling, supports those fact findings. *Id.* at 818–19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 819.

■ When the record is silent on the reasons for the trial court's ruling, or when there are no explicit fact findings and neither party timely requested findings and conclusions from the trial court, we imply the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *Id.* We then review the trial court's legal ruling de novo unless the implied fact findings supported by the record are also dispositive of the legal ruling. *Id.*

■ We must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case even if the trial court gave the wrong reason for its ruling. *Armendariz v. State,* 123 S.W.3d 401, 404 (Tex.Crim. App.2003), *cert. denied,* 541 U.S. 974, 124 S.Ct. 1883, 158 L.Ed.2d 469 (2004); *Ross,* 32 S.W.3d at 856; *Romero,* 800 S.W.2d at 543.

### B. Standing

Before addressing whether appellant's Fourth Amendment rights were violated by the continued detention, we must first assess whether he has standing to complain about the seizure of the methamphetamine ice. Appellant has standing to contest the search only if he had a reasonable expectation of privacy in the area or item

searched. *See Kothe v. State,* 152 S.W.3d 54, 59 (Tex.Crim.App.2004).

■ Proof of "a reasonable expectation of privacy" is at the forefront of all Fourth Amendment claims. *See id.* Any defendant seeking to suppress evidence obtained in violation of the Fourth Amendment must first show that he personally had a reasonable expectation of privacy that the government invaded. *Id.*[4] He must prove that he was a "victim" of the unlawful search or seizure. *Id.* A defendant has no standing to complain about the invasion of someone else's personal rights. *Id.* Only after a defendant has established his standing to complain may a court consider whether he has suffered a substantive Fourth Amendment violation. *Id.* In addressing standing, it is critical to identify the precise police conduct being objected to, for this may itself turn out to be determinative on the standing issue. *Id.*

The trial court ruled that C.D.'s statement and the methamphetamine ice seized from C.D. were admissible because appellant had no privacy interest in his son's pants and because the stop of the Oldsmobile was justified. Although we agree appellant has no standing to complain about any search and seizure of C.D., that issue is transcended by appellant's complaint that the search and seizure were the result of an illegally prolonged detention as discussed more thoroughly below. *See id.*

■ The trial court was correct in concluding that appellant had no standing to challenge the search of C.D.'s pants. It is undisputed that the police found over 440

---

**4.** *See Rakas v. Illinois,* 439 U.S. 128, 139, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978) (noting that issue of standing involves two inquiries: first, whether defendant has alleged an "injury in fact"; and second, "whether the proponent is asserting his own legal rights and interests rather than basing his claim for relief upon the rights of third parties"). "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 966–67, 22 L.Ed.2d 176 (1969).

grams of methamphetamine ice in C.D.'s pants, and not on appellant's person, in the Oldsmobile, or at appellant's residence. It is also undisputed that C.D. told Detective Martinez that appellant gave him the drugs to hold and hide. The issue, then, is whether appellant can assert a right to privacy in the search of his juvenile son's body or in his son's statements. In this case, the State contends that appellant lacks standing to complain about the admissibility of the drugs because appellant had no reasonable expectation of privacy regarding his son's pants. True enough. *See id.* (holding that a defendant driver had no standing to complain about the search of a passenger's bra after police found two balloons containing heroin). Appellant cannot complain about a search of C.D. *See id.* But that is not the basis of his complaint.

Rather, appellant's Fourth Amendment claim is based upon a purportedly prolonged detention of himself as the driver of the car. Appellant argues that, although the initial stop for violating traffic laws was justified, once Officer Holsey arrested him for not having a license or registration, any further detention of him violated the Fourth Amendment. He claims that the later removal of C.D. from the car and search of his person were made by exploiting the extended detention and are therefore "fruits of the poisonous tree." *See id.* (citing *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963)).

The testimony in this case establishes that both appellant and C.D. had a reasonable expectation of privacy in the right to be free from an illegal detention. *See id.* at 61. The intrusion a vehicle stop causes is personal to those in the car when it occurs. *Id.*[5]

Both appellant and C.D. had a Fourth Amendment right to not be detained beyond the time necessary for Officer Holsey to complete his investigation. *See id.* Thus, appellant has standing to complain about any illegally prolonged detention. If the officers' conduct in removing C.D. from the Oldsmobile and searching him was "unreasonable" under the Fourth Amendment, appellant has standing to complain about the subsequent search of C.D. *See id.* That search is "fruit of the poisonous tree" if it constituted an exploitation of the illegal detention. *Id.*

We turn, then, to the question of whether Officer Holsey's conduct in removing C.D. from the Oldsmobile and searching him was "unreasonable" under the Fourth Amendment.

## C. "Reasonableness" of Detention under the Fourth Amendment

On appeal, the question of whether a specific search or seizure is "reasonable" under the Fourth Amendment as applied to the historical facts found by the trial court is subject to de novo review. *Id.; State v. Johnson,* 896 S.W.2d 277, 285 (Tex.App.-Houston [1st Dist.] 1995), *aff'd,* 939 S.W.2d 586 (Tex. Crim.App.1996). In assessing this legal

---

**5.** *United States v. Roberson,* 6 F.3d 1088, 1091 & n. 6 (5th Cir.1993) ("Whereas the search of an automobile does not implicate a passenger's fourth amendment rights, a stop results in the seizure of the passenger and driver alike. Thus, a passenger of a stopped automobile does have standing to challenge the seizure as unconstitutional."); *United States v. Powell,* 929 F.2d 1190, 1195 (7th Cir.1991) (collecting cases and concluding that passengers, as well as drivers, have standing to challenge a vehicle stop or prolonged detention); *see also United States v. Woodrum,* 202 F.3d 1, 6 (1st Cir.2000) (holding that "each occupant of a car has a right to challenge the propriety of a traffic stop under the Fourth Amendment").

issue, courts give almost total deference to the trial court's findings of historical fact. *Kothe*, 152 S.W.3d at 60; *Johnson*, 896 S.W.2d at 285. However, questions involving legal principles and the application of law to established facts are properly reviewed de novo. *Kothe*, 152 S.W.3d at 60; *Johnson*, 896 S.W.2d at 285. Thus, in deciding whether appellant's continued detention after his arrest was "reasonable" under the specific circumstances, we view the trial court's factual findings in the light most favorable to his ruling, but we decide the issue of "reasonableness" as a question of Fourth Amendment law under Supreme Court precedent. *Kothe*, 152 S.W.3d at 63.

The Supreme Court states that Fourth Amendment "reasonableness" is measured "in objective terms by examining the totality of the circumstances"; it "eschew[s] bright-line rules, instead emphasizing the fact-specific nature of the ... inquiry." *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996). It requires a balance between the public interest served and the individual's right to be free from arbitrary detentions and intrusions. *See Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977).

Routine traffic stops are analogous to investigative detentions and are governed by *Terry v. Ohio. Gansky v. State*, 180 S.W.3d 240, 242–43 (Tex.App.-Fort Worth 2005, pet. ref'd); *see Berkemer v. McCarty*, 468 U.S. 420, 436, 104 S.Ct. 3138, 3148, 82 L.Ed.2d 317 (1984) (noting traffic stop "significantly curtails the 'freedom of action' of the driver and the passengers" alike); *Terry v. Ohio*, 392 U.S. 1, 29–30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968). A *Terry* analysis has two prongs. *Terry*, 392 U.S. at 29–30, 88 S.Ct. at 1884. A court must first decide whether the officer's action was justified at its inception. *Id.* Here, neither party questions the validity of the initial stop or appellant's custodial arrest for not having a driver's license or proof of insurance. Therefore, the trial court focused on the second prong of *Terry*—whether the search and seizure of C.D. was reasonably related, in scope, to the circumstances that justified the stop in the first place.

In deciding whether the scope of a *Terry* detention is "reasonable," the general rule is that an investigative stop can last no longer than necessary to effect the purpose of the stop. *See id.* The Supreme Court has held that an officer who makes a lawful custodial arrest of the occupant of an automobile may, as a contemporaneous incident of the arrest, search the passenger compartment of the automobile. *New York v. Belton*, 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981). Thus, when a driver violates a traffic law and is subsequently arrested, the extended period of time necessary to search the driver's car is reasonable. *See id.* Here, Officer Holsey was justified in detaining appellant after the arrest and by removing C.D. and the other passenger from the Oldsmobile so that he could search it.

*Terry* also authorizes a patdown search of a person for weapons when the officer is justified in believing that the detainee may be armed and presently dangerous. *Terry*, 392 U.S. at 29–30, 88 S.Ct. at 1884. The purpose of a *Terry* search is to neutralize a potentially volatile situation and allow an officer to investigate without fear of violence; it is not meant to discover evidence of a crime. *See id.; Wood v. State*, 515 S.W.2d 300, 306 (Tex.Crim.App. 1974). This does not mean that the officer must be absolutely certain that the individual is armed; nor does the officer have to have probable cause to arrest. *Davis v. State*, 61 S.W.3d 94, 97 (Tex.App.-Amarillo 2001, no pet.). Rather, the issue is wheth-

er a reasonably prudent officer in the same circumstances would be warranted in believing that his safety or that of others is in danger. *See Carmouche,* 10 S.W.3d at 329 (stating that the officer must have before him specific and articulable facts reasonably leading him to conclude that the suspect might possess a weapon). Moreover, that weapons and violence are associated with the drug trade is rather settled. *Id.* at 330. Thus, encountering one who is reasonably suspected of engaging in drug activity can justify a brief and minimally intrusive frisk of his person. *Id.*

In this case, the trial court concluded that the traffic stop and custodial arrest were legal based upon "reasonable suspicion and probable cause for not maintaining, having, a license or insurance." The trial court also concluded that the prolonged detention and search of C.D., the other passenger, and the car were reasonable "based on the information, based on the suspicion of drug activity." The trial court noted that "it was not unreasonable to frisk a person pursuant to [a] Terry stop, which is all that was involved with the son." The trial court concluded that none of appellant's Fourth, Fifth, Ninth, or Fourteenth Amendment rights under the U.S. Constitution were violated, nor were his rights under the Texas Constitution violated. We agree as to the Fourth Amendment ground only.

■ Officer Holsey was justified in frisking C.D. after removing him from the car because he had articulable facts indicating that C.D. may have had a weapon. *See id.* at 329. Specifically, Detective Blaisdell, an undercover narcotics investigator, had watched appellant transport a brown paper sack with a heavy object from his house to his car after the officer arranged for an informant to order a pound of methamphetamine ice from someone in appellant's house. After following appel-

lant and observing several traffic law violations, Detective Blaisdell called Officer Holsey and told him to stop the Oldsmobile, ticket the driver for violating traffic laws, and pat down everyone in the car for weapons and cell phones. Detective Martinez was also justified in asking C.D. about the bulge in his pants because the search of the Oldsmobile had not been completed, the detective knew that C.D. had been riding with appellant—a suspected methamphetamine ice dealer—on the way to a possible drug deal, and the detective noticed that Officer Holsey had not seen or felt the bulge during his frisk of C.D. Thus, the officers were justified in believing that a weapons search was necessary for their safety. *See id.* at 330.

Viewing the totality of the circumstances in the light most favorable to the trial court's factual findings, the officers' removal of C.D. from the car and subsequent frisk of his person were not illegally prolonged and were "reasonable" as a matter of substantive Fourth Amendment law. *See Robinette,* 519 U.S. at 39, 117 S.Ct. at 421. Accordingly, we overrule appellant's first issue.

## IV. C.D.'s Statement

The trial court held that C.D.'s statement that appellant gave him the drugs to hide was admissible because it was nontestimonial and, therefore, not subject to exclusion under the Sixth Amendment. In his second issue, appellant asserts that the statement was testimonial, and the trial court's ruling was error because it violated his Sixth Amendment confrontation right under *Crawford. See Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The State asserts that because Detective Martinez's questions were motivated by a concern for officer safety and because C.D. lacked the capacity to appreciate the legal conse-

quences of his response, the response was nontestimonial and, therefore, admissible despite C.D.'s absence.[6] *See id.*

## A. Standard of Review and Applicable Law

In *Crawford,* the Supreme Court held that the admission of a hearsay statement made by a nontestifying declarant violates the Sixth Amendment if the statement was testimonial when made and the defendant lacked a prior opportunity for cross-examination. 541 U.S. at 68, 124 S.Ct. at 1374. Thus, a "testimonial" statement is inadmissible absent a showing that the declarant is presently unavailable and the defendant had a prior opportunity for cross-examination, even if the statement falls under a firmly rooted hearsay exception such as the excited utterance exception or bears particularized guarantees of trustworthiness. *Id.* at 58–60, 68, 124 S.Ct. at 1368–69, 1374. Although the *Crawford* opinion does not provide a comprehensive definition of "testimonial," it does indicate that the term covers ex parte in-court testimony or its functional equivalent, extrajudicial statements contained in formalized testimonial materials such as prior testimony at a preliminary hearing, before a grand jury, or at former trial, and police interrogations. *Walter v. State,* 209 S.W.3d 722, 728 (Tex.App.-Texarkana 2006, pet. granted) (citing *Crawford,* 541 U.S. at 52, 124 S.Ct. at 1364).

In *Wall v. State,* the Texas Court of Criminal Appeals concluded that the testimonial character of a statement is determined by the declarant's ability to appreciate the legal ramifications of his statement. 184 S.W.3d 730, 742 (Tex.Crim.App.2006). Subsequent to *Wall,* the Supreme Court provided further guidance regarding statements that are considered "testimonial" for purposes of *Crawford. See Davis v. Washington,* —— U.S. ——, —— – ——, 126 S.Ct. 2266, 2273–74, 165 L.Ed.2d 224 (2006). The question in *Davis* was "whether, objectively considered, the interrogation that took place in the course of the 911 call produced testimonial statements." *See id.* at 2276. The Court stated that the declarant's statements were not testimonial because (1) she was describing events as they were actually happening rather than past events, (2) any reasonable listener would recognize that the declarant was facing an ongoing emergency, (3) the nature of what was asked and answered, when viewed objectively, was such that elicited statements were necessary to be able to resolve the present emergency, rather than simply to learn what had happened in the past, and (4) the declarant was frantically answering the 911 emergency operator's questions over the phone, in an environment that was not tranquil. *Id.* at 2276–77; *Vinson v. State,* 221 S.W.3d 256, 263 (Tex.App.-Houston [1st Dist.] 2006, pet. granted); *Rangel v. State,* 199 S.W.3d 523, 534 (Tex.App.-Fort Worth 2006, pet. granted) (op. on PDR).

The *Davis* Court cautioned, however, that "a conversation which begins as an interrogation to determine the need for emergency assistance" can evolve into testimonial statements "once that purpose has been achieved." *Davis,* 126 S.Ct. at 2277. In contrast to its holding regarding the 911 conversation, the Court held that the *at-the-scene* statements were testimonial. *Id.* at 2278. In support of this second holding, the Court reasoned that

> [i]t is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct.... There was no emer-

---

**6.** When C.D. was released from juvenile custody, C.D. left the country and is currently at large in Mexico; therefore, he was not called to testify at appellant's trial.

gency in progress; the interrogating officer testified that he had heard no arguments or crashing and saw no one throw or break anything.... When the officers first arrived, [the complainant] told them that things were fine ...., and there was no immediate threat to her person. When the officer questioned [her] for the second time, and elicited the challenged statements, he was not seeking to determine .... "what is happening," but rather "what happened." Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime.

*Id.*

Likening the statement before it to that in *Crawford,* the Court noted:

Both declarants were actively separated from the defendant.... Both statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed. And both took place some time after the events described were over. Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial.

*Id.* (emphasis in original).

So, from *Davis,* we learn that there are at least four factors we may consider when determining whether a statement is testimonial or not, and the timing, purpose, and setting of the statement can be relevant considerations. *See Vinson,* 221 S.W.3d at 263 (holding that a declarant's statement that her boyfriend had assaulted her was nontestimonial where declarant had been screaming for help on 911 call and appeared injured when police entered her apartment and asked her "what happened"); *Walter,* 209 S.W.3d at 728 (holding that co-conspirator's remarks in private conversation with his brother hours after murders were not testimonial statements because the conversation involved only the two brothers, took place at co-conspirator's residence, and co-conspirator spoke nervously in an attempt to avoid being connected to the crimes); *Rangel,* 199 S.W.3d at 534 (holding that a declarant's statements were testimonial because they were made two months after the emergency). The holding in *Davis* also reveals that statements are nontestimonial when made in the course of police interrogation under circumstances that objectively indicate that the primary purpose of the interrogation is to enable police to meet an ongoing emergency. *See Grant v. State,* 218 S.W.3d 225, 231 (Tex.App.-Houston [14th Dist.] 2007, pet. ref'd); *Cook v. State,* 199 S.W.3d 495, 497 (Tex.App.-Houston [1st Dist.] 2006, no pet.). Conversely, they are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. *See Grant,* 218 S.W.3d at 231; *Cook,* 199 S.W.3d at 497.

Consistent with this holding, in determining whether statements are testimonial, Texas courts generally have looked to the degree of formality of a declarant's interaction with police, the purpose and structure of police questioning, and the likelihood that the declarant expects that the statements could be used in a criminal prosecution. *Cook,* 199 S.W.3d at 497; *see Spencer v. State,* 162 S.W.3d 877, 879 (Tex. App.-Houston [14th Dist.] 2005, pet. ref'd). A witness's responses to preliminary questions by police officers at the scene of a crime while assessing and *securing the scene* are not testimonial. *See Delacueva v. State,* No. 14–05–01115–CR, 2006 WL 3589482, at *3 (Tex.App.-Houston [14th Dist.] Dec. 12, 2006, pet. ref'd) (not desig-

nated for publication); *Spencer*, 162 S.W.3d at 879.

In *Delacueva*, two police officers reported to a Walgreen's parking lot after receiving calls about a fight. *Delacueva*, 2006 WL 3589482, at *3. The officer found the victim-witness lying face down, crying, and bleeding from her face. *See id.* The officers asked the victim who hurt her, and she pointed at the defendant and said, "he had kicked her in the face." *Id.* The trial court used the analysis in *Davis* to determine that the officer's question was "for the purpose of determining the extent of [the victim's] injuries and gathering information for dispatch." *Id.* "They were trying to provide 'assistance to meet an ongoing emergency'" and were securing the scene. *See id.; Marc v. State*, 166 S.W.3d 767, 779 (Tex.App.-Fort Worth 2005, pet. ref'd) (noting that a police officer's motivations during the officer's preliminary questions are relevant when determining whether the witness's responses are testimonial).

We defer to a trial court's determination of historical facts and credibility, but we review a constitutional legal ruling, i.e. whether a statement is testimonial or nontestimonial, de novo. *See Wall*, 184 S.W.3d at 742.

### B. Analysis

 First, appellant admitted to Detective Martinez that he gave C.D. the methamphetamine ice; however, he said that it was not his. This statement was admitted into evidence without objection. To preserve error, a party must continue to object each time the objectionable evidence is offered. *Fuentes v. State*, 991 S.W.2d 267, 273 (Tex.Crim.App.), *cert. denied*, 528 U.S. 1026, 120 S.Ct. 541, 145 L.Ed.2d 420 (1999); *Ethington v. State*, 819 S.W.2d 854, 858–59 (Tex.Crim.App. 1991). A trial court's erroneous admission of evidence will not require reversal when other such evidence was received without objection, either before or after the complained-of ruling. *Leday v. State*, 983 S.W.2d 713, 718 (Tex.Crim.App.1998); *Johnson v. State*, 803 S.W.2d 272, 291 (Tex.Crim.App.1990), *cert. denied*, 501 U.S. 1259, 111 S.Ct. 2914, 115 L.Ed.2d 1078 (1991), *overruled on other grounds by Heitman v. State*, 815 S.W.2d 681 (Tex. Crim.App.1991). This rule applies whether the other evidence was introduced by the defendant or the State. *Leday*, 983 S.W.2d at 718. Because Detective Martinez's testimony regarding appellant's statement that "he did give his son the methamphetamine" was admitted without objection, we must only determine whether the rest of C.D.'s statement to Detective Martinez that appellant gave him the drugs *to hide* violated *Crawford*. *See Fuentes*, 991 S.W.2d at 273.

Detective Martinez asked C.D. several questions at the scene. However, the trial court only admitted into evidence the officer's first question—the inquiry about the bulge in C.D.'s pants—and C.D.'s first response, that he did not know what it was, but that appellant had given it to him to hide.[7]

Both parties agree that C.D.'s response here was an excited utterance and there-

7. The trial court held that
 under the Crawford [sic] test, looking at the facts and the circumstances, the fact that he was not under arrest, the fact that there wasn't a formal interrogation, hadn't completely developed, the excited nature and state of what was going on, ... [the statement] wasn't testimonial. It was quickly fixin' to become that way.... And I find that [the exception ends after] the initial statements of, basically paraphrased to the effect, of "my dad gave it to me to hide.".... Once that information develops, an interrogation begins. Any further statements I find are covered by Crawford [sic], but not the initial statement.

fore admissible as an exception to the hearsay rule. TEX.R. EVID. 803(2); *Zuliani v. State,* 97 S.W.3d 589, 595 (Tex.Crim. App.2003). Therefore, our analysis will center on whether the statement was testimonial in nature. *See Wall,* 184 S.W.3d at 742 (holding that a statement that qualifies as an excited utterance can still be testimonial in nature, and a reviewing court must inquire whether such a statement violates a defendant's right to confrontation).

The narcotics detectives had instructed Officer Holsey to frisk the front-seat passenger and C.D. for weapons and cell phones. Therefore, after he arrested appellant and placed him in the patrol car, Officer Holsey walked back to the Oldsmobile.[8] He then asked C.D., who was sitting in the driver's side back seat, to step out of the car. C.D. stepped out with his back to Officer Holsey and was bent over the Oldsmobile's trunk during the brief frisk.

Detective Martinez walked up the service ramp and towards the Oldsmobile just as Officer Holsey was patting C.D. down; because C.D. was facing him (and facing away from Officer Holsey), he noticed a suspicious bulge in C.D.'s pants. Officer Holsey told C.D. to stand at the guard rail. Neither C.D. nor the other passenger were handcuffed at this point. Detective Martinez, concerned that Officer Holsey did not see the bulge and that C.D. might have a weapon hidden there, approached C.D. and the other male passenger at the guardrail and asked C.D. what was in his pants. C.D. immediately started crying, looked at the patrol car where appellant was sitting, and responded that he did not know what it was and that appellant had given it to him to hide. Detective Martinez told C.D. to pull it out, and C.D. removed the plastic bag of drugs from his pants.

It is important to note that Detective Martinez did not ask appellant or the adult passenger any questions and did not inspect the interior or the trunk of the Oldsmobile for drugs *before* approaching C.D.[9] Thus, when Detective Martinez arrived, his *first priority* was to secure the scene by ensuring that Officer Holsey had not missed identifying a possible weapon hidden in C.D.'s pants.[10] *See Davis,* 126 S.Ct. at 2274 (holding that courts should consider whether the "primary purpose" of the officer's questioning was "to establish or prove past events potentially relevant to later criminal prosecution"); *Delacueva,* 2006 WL 3589482, at *3 (noting that an officer's need to meet an ongoing emergency is a relevant consideration in the *Crawford* analysis); *Marc,* 166 S.W.3d at 779 (same).

Detective Martinez's testimony at trial supports this conclusion:

[The State]: And you thought what was in the—what did you think was in the teenager's pants when you asked that question?

[Martinez]: A weapon.

[The State]: When you asked that question, did you ever have any inten-

---

**8.** The officers found cell phones on appellant but Neither of the two passengers had a cell phone.

**9.** In his brief, appellant asserts that the officers completed their search of the interior and trunk of the Oldsmobile and questioned appellant before asking C.D. about the suspicious bulge in his pants. Appellant provided no citations to the record to support this claim, and after a careful review of the rec-

ord, we determine that appellant's assertion here about the timeline of events is incorrect.

**10.** While at the scene of appellant's arrest, Detective Martinez saw the brown paper sack sitting on the floorboard in the back of the Oldsmobile. It is unclear from the record whether Detective Martinez saw this sack before or after questioning C.D. and whether he knew that the sack no longer contained the plastic bag of drugs.

tion of getting information from this teenage son that you would use for testimony?

[Martinez]: No, sir.

[The State]: What were you concerned about?

[Martinez]: A weapon.

[The State]: And getting shot?

[Martinez]: Yes, sir.

The evidence at trial established that Detective Martinez walked up to the scene of a crime where a suspected drug dealer had just been arrested. Detective Martinez saw Officer Holsey miss the possible weapon in C.D.'s pants during the frisk and then saw Officer Holsey direct C.D. and the other male passenger, who were not handcuffed or otherwise secured, to the guardrail. When viewed objectively, because the officers were potentially in danger, Detective Martinez's preliminary question was motivated by a need to secure the scene, and C.D.'s initial answer was in response to the officer's attempt to secure the scene and to resolve a potential emergency. *See Delacueva,* 2006 WL 3589482, at *3; *Vinson,* 221 S.W.3d at 263; *Rangel,* 199 S.W.3d at 534. Thus, we conclude that C.D.'s initial statement was not the product of custodial police interrogation, nor was it a response to tactically structured police questioning. *See Davis,* 126 S.Ct. at 2273–74; *Spencer,* 162 S.W.3d at 879. Therefore, we agree with the trial court that C.D.'s statement that appellant had given him the bag to hide was nontestimonial. *See Davis,* 126 S.Ct. at 2273–74; *Spencer,* 162 S.W.3d at 879; *Kearney v. State,* 181 S.W.3d 438, 442 (Tex.App.-Waco 2005, pet. ref'd); *Ruth v. State,* 167 S.W.3d 560, 568–69 (Tex.App.-Houston [14th Dist.] 2005, pet. ref'd); *Marc,* 166 S.W.3d at 779.

Because we have determined that C.D.'s statement was nontestimonial based on the lack of a police interrogation, we do not need to address whether C.D. appreciated the consequences of the statement. *See Marc,* 166 S.W.3d at 779 (declining to address the declarant's appreciation of the consequences of his statement because the lack of a custodial interrogation was sufficient to determine that the statement was nontestimonial); *Spencer,* 162 S.W.3d at 880–83 (same). Therefore, we hold that the trial court did not err by concluding that C.D.'s first response was admissible and that appellant's motion to suppress was correctly denied. Accordingly, we overrule appellant's second issue.

## V. Conclusion

Having overruled appellant's two issues, we affirm the trial court's judgment.