

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 2-09-126-CR

BONNIE MILLER REED                                                          APPELLANT

V.

THE STATE OF TEXAS                                                              STATE

------------

FROM COUNTY CRIMINAL COURT NO. 3 OF TARRANT COUNTY

------------

## OPINION

------------

### I. Introduction

Appellant Bonnie Miller Reed challenges the trial court's denial of her motion to suppress in a driving while intoxicated (DWI) case. In one issue, Reed argues that the trial court erred by finding reasonable suspicion existed for her detention on suspected DWI. We affirm.

## II. Factual and Procedural Background

Bedford Police Officer Chris Miller was the only witness at Reed's suppression hearing.[1] In addition to testifying that he had been a police officer for three years and had attended specialized training for field sobriety tests, he also testified to the following.

While out on routine patrol around 12:45 a.m. on February 12, 2008, he had seen a vehicle driving eastbound on State Highway 183 veer onto the shoulder of the roadway.[2] When asked to describe how far the vehicle had crossed over onto the shoulder, Officer Miller stated, "[I]f you divide the vehicle down the middle, I would say the right-hand, or the passenger compartment, was off of the roadway on the shoulder. The driver's side, or the left side, was still in the roadway." Officer Miller activated his in-car video camera at that time and proceeded to follow the vehicle. He observed the driver, later identified as Reed, turn on her right-hand turn signal when there were no exits or roads to turn onto and leave the signal on for approximately one-quarter to one-half mile before moving into the exit lane. Officer Miller again saw Reed's vehicle veer onto the shoulder of the roadway before it exited. Officer Miller stated and the videotape confirmed that when Reed's vehicle

---

[1] The State also introduced the videotape of the stop made from the camera in Officer Miller's patrol unit.

[2] Officer Miller testified that the vehicle was driving westbound. A review of the videotape, however, shows that the vehicle was actually traveling eastbound. Because this is irrelevant to the issue at hand, we note it simply for the sake of accuracy.

veered onto the shoulder the second time, "[t]he passenger tires [were] clearly over the line."

Officer Miller testified that although he had not seen Reed entering or leaving a bar, she had been driving away from an area of Bedford that contained several bars and restaurants that served alcohol, and that he had previously pulled over other drivers for DWI in that same area. When asked about Reed's driving and the surrounding conditions, Officer Miller stated that Reed's movements had not been jerky or violent but had been more like a gradual drift, that the traffic on the roadway had been light, and that Reed had not posed an immediate danger to any other vehicles. Officer Miller also stated that, based on his experience and training, intoxicated drivers sometimes drift.

Finally, Officer Miller testified that in addition to the probable cause from the traffic violations—that is, failure to maintain a single lane and illegal use of a turn signal—he had stopped Reed because he suspected that she might be intoxicated based on her driving, the time of day, the area of the city that she had been coming from, and his experience with intoxicated drivers exhibiting similar driving characteristics.

After hearing all the evidence, the trial court denied Reed's motion to suppress, and on March 18, 2009, it entered findings of fact and conclusions of law. The trial court's findings were:

3

The [trial court] finds there was no traffic violation under Section 545.060(a) [of the] Transportation Code. There is no evidence that the Defendant's failure to drive in a single lane was unsafe. The use of the turn signal was not done in an illegal manner. There was no probable cause for the stop. This leaves the question of whether there was reasonable suspicion to justify the stop.

The reasons against the unlawfulness of the detention in this case are:

1. No traffic violation.
2. Not weaving within the lane.
3. Nothing unsafe about weaving on to the shoulder.
4. Very light traffic.
5. No erratic speed changes.
6. Driving within the speed limit.

The reasons for the lawful detention in this case are:

1. Crossing on to the shoulder of the roadway by one-half width of the vehicle.
2. Crossing on to the shoulder a second time by a few inches.
3. Unusual use of turn signal. Turn[ed] on when not approaching an exit and kept on for an unusual length of time for approximately one-half mile.
4. Leaving the bar area of the city at approximately 12:45 a.m.
5. Based on the Officer's training and experience, intoxicated drivers show these characteristics of driving.
6. Based on his training and experience, the officer suspected the driver might be intoxicated.

The trial court concluded that "the articulated facts justifying the stop were sufficient to overcome the articulated facts mitigating against the stop and were sufficient to give Officer Miller a reasonable suspicion to detain [Reed] for further investigation." Thus, Reed's "Fourth Amendment rights under the United States

4

Constitution and under Article 1[,] Section 9 of the Texas Constitution were not violated."

Reed subsequently pleaded guilty to the offense of DWI but preserved her right to appeal the denial of the motion to suppress. The trial court sentenced Reed to fifteen days' confinement and assessed a $500 fine. This appeal followed.

### III. Discussion

In her sole issue, Reed argues that the trial court erred by concluding that Officer Miller had reasonable suspicion, under both the United States and Texas constitutions, to stop her for suspected DWI.[3]

### A. Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not

---

[3] When, as in this case, the appellant has not separately briefed state and federal constitutional claims, we assume that the appellant claims no greater protection under the state constitution than that provided by the federal constitution. *See Varnes v. State*, 63 S.W.3d 824, 829 (Tex. App.—Houston [14th Dist.] 2001, no pet.). Therefore, we will analyze Reed's claim solely under the Fourth Amendment of the United States Constitution, following guidelines set by the United States Supreme Court in interpreting the Fourth Amendment. *See State v. Guzman*, 959 S.W.2d 631, 633 (Tex. Crim. App. 1998).

turn on credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).

## B.  Applicable Law

The Fourth Amendment protects against unreasonable searches and seizures by government officials.  U.S. Const. amend. IV; *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007).  To suppress evidence because of an alleged Fourth Amendment violation, the defendant bears the initial burden of producing evidence that rebuts the presumption of proper police conduct.  *Amador*, 221 S.W.3d at 672. A defendant satisfies this burden by establishing that a search or seizure occurred without a warrant.  *Id*.  Once the defendant has made this showing, the burden of proof shifts to the State, which is then required to establish that the search or seizure was conducted pursuant to a warrant or was reasonable.  *Id*. at 673; *Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005); *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005).

A detention, as opposed to an arrest, may be justified on less than probable cause if a person is reasonably suspected of criminal activity based on specific, articulable facts.  *Terry v. Ohio*, 392 U.S. 1, 22, 88 S. Ct. 1868, 1880 (1968); *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000).[4]  An officer

---

[4] Because a routine traffic stop typically involves only a short, investigative detention, as opposed to a custodial arrest, we analyze traffic stops under the principles developed for investigative detentions set forth in *Terry v. Ohio*.  392 U.S.

6

conducts a lawful temporary detention when he or she has reasonable suspicion to believe that an individual is violating the law. *Ford*, 158 S.W.3d at 492. Reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Id.* This is an objective standard that disregards any subjective intent of the officer making the stop and looks solely to whether an objective basis for the stop exists. *Id.*

## C. Analysis

In her sole issue, Reed argues that neither the trial court's findings nor Officer Miller's testimony rises to the level of proof required for an investigative detention for DWI. Reed cites several cases in support of her argument. *See Fowler v. State*, 266 S.W.3d 498, 505 (Tex. App.—Fort Worth 2008, pet. ref'd); *State v. Palmer*, No. 02-03-00526-CR, 2005 WL 555281, at *1, 3 (Tex. App.—Fort Worth Mar. 10, 2005, pet. dism'd) (mem. op., not designated for publication); *State v. Arriaga*, 5 S.W.3d 804, 807 (Tex. App.—San Antonio 1999, pet. ref'd); *State v. Tarvin*, 972 S.W.2d 910, 912 (Tex. App.—Waco 1998, pet. ref'd). These cases, however, are all distinguishable.

at 22, 88 S. Ct. at 1880; *see Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S. Ct. 3138, 3150 (1984); *Martinez v. State*, 236 S.W.3d 361, 369 (Tex. App.—Fort Worth 2007, no pet.).

In *Fowler*, the officer testified that he had initiated the stop because Fowler's truck had crossed into an adjacent same-direction lane by a tire's width and had drifted within its own lane on two occasions. 266 S.W.3d at 499. In *Arriaga*, the officer testified that he had initiated the stop because Arriaga's vehicle had drifted out of its lane on multiple occasions. 5 S.W.3d at 807. And in *Tarvin*, the officer testified that he had initiated the stop because Tarvin's vehicle had been weaving within its own lane of traffic. 972 S.W.2d at 912. Here, however, Officer Miller not only testified that he had stopped Reed because of her driving violations, but also because he had suspected that she might be intoxicated based on the time of day, the area of the city that she had been coming from, and his experience with intoxicated drivers exhibiting similar characteristics of driving. *See Curtis v. State*, 238 S.W.3d 376, 380–81 (Tex. Crim. App. 2007) (applying the totality of the circumstances test and concluding that a rational inference could be made that the driver was intoxicated based on the driver's weaving, the time of day, and the officer's experience).

In *Palmer*, the officer testified to facts similar to those in this case. *See* 2005 WL 555281, at *1–2. However, the trial court in *Palmer* granted the defendant's motion to suppress and did not enter findings of fact or conclusions of law. This court, on appeal, noted that the videotape from the officer's in-car camera did not support the officer's assertion that the driver had applied his brakes in a sudden and

8

unsafe manner. *Id.* Thus, we concluded that, under the totality of the circumstances, the facts were insufficient to support reasonable suspicion. *Id*.

This appeal differs from *Palmer* in that the trial court here entered findings of fact and found Officer Miller's testimony to be credible. Furthermore, the videotape from Officer Miller's in-car camera supports his testimony. Thus, after giving almost total deference to the trial court's rulings on application-of-law-to-fact questions that turn on credibility and demeanor and reviewing de novo those rulings that do not, we conclude that the totality of the circumstances surrounding the stop, support a reasonable suspicion that Reed was driving while intoxicated. Therefore, the trial court did not err by denying Reed's motion to suppress. Accordingly, we overrule Reed's first issue.

## IV. Conclusion

Having overruled Reed's sole issue, we affirm the trial court's judgment.


BOB MCCOY
JUSTICE


PANEL: DAUPHINOT, GARDNER, and MCCOY, JJ.

DAUPHINOT, J. filed a dissenting opinion.

PUBLISH

DELIVERED: March 11, 2010

9



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-09-126-CR

BONNIE MILLER REED                                        APPELLANT

V.

THE STATE OF TEXAS                                              STATE

------------

FROM COUNTY CRIMINAL COURT NO. 3 OF TARRANT COUNTY

------------

## DISSENTING OPINION

------------

I, frankly, am reluctant to write this dissent because I am concerned that it could be construed as criticism of an officer who in all ways displayed a conscientious respect for the law and treated Appellant with courtesy. In short, Officer Chris Miller behaved as I would hope all our law enforcement officers would. But I must respectfully dissent from the majority opinion because I do not believe that the record supports a finding that Officer Miller had reasonable suspicion to detain Appellant when the officer turned on his overhead lights and Appellant submitted to his show of authority.

The majority states that Officer Miller was driving eastbound on Highway 183, also known as Airport Freeway, at about 12:45 a.m. when he noticed Appellant's dark-colored Volkswagen driving in front of him on the highway. Although the majority is correct in stating that he testified that the time was 12:45 a.m., the record actually shows that Officer Miller first saw Appellant's vehicle twenty minutes earlier at 12:25 a.m:

Q. Okay. So it wasn't 12:45, 1:00?

A. When I initially observed the vehicle?

Q. Correct.

A. Yes, that's correct.

Specifically, Officer Miller testified, "This was noted in my report that it was 25 minutes after midnight on the date in question."

As the majority notes, he testified that Appellant "had been driving away from an area of Bedford that contained several bars and restaurants that served alcohol" and that he had previously pulled over other drivers for driving while intoxicated (DWI) in that same area.[1] But the video reveals that Appellant was on a freeway that is a major state highway with restricted ingress and egress and that passes through residential areas, warehouse areas, office areas, and areas with bars and restaurants. The portion of Highway 183 visible on the videotape made by Officer

_____

[1] Majority op. at 3.

1

Miller is raised and well separated from the structures along the access road. He did not see Appellant enter the freeway. He first saw her driving on Highway 183.

Officer Miller testified that he "was on routine patrol [and] was driving westbound [sic] on 183 about to get on 121 and go north. . . . There was a—it was a dark-colored Volkswagen four-door sedan driving in front of [him] on the highway." On cross-examination he clarified his testimony:

A.    Again, it's just—it's just an observation. I'm not saying that she was leaving a bar. It was just I observed her leaving a part of our city that has many bars. It's just an observation.

Q.    And you didn't see her on any side streets because, I mean, you can't—let me back up. You would have to get off the highway or get on to the highway to get to or leave from a bar in Bedford, right?

A.    Yes.

. . . .

Q.    So you just see her driving down the highway. You never saw her enter onto the highway; is that correct?

A.    No.

. . . .

Q.    So, again, you didn't ever see her leave a bar?

A.    No, I didn't see her leave a bar.

Officer Miller testified that he never saw Appellant enter or leave a bar or a restaurant; he only saw her drive past bars and restaurants on a major state highway that passes above them. If we hold that merely driving past a bar provides

2

reasonable suspicion justifying the detention of a motor vehicle and requiring the driver to submit to questioning and field sobriety tests, every person leaving downtown Fort Worth, or driving down 6th Street in Austin, or driving down a highway or freeway through any commercial area will be fair game to be pulled over, questioned, searched for the officer's safety, and hauled out of the car to perform feats of line-walking, nose-touching, and balancing on one foot. Indeed, if one lives across the street from fraternity row, one should be prepared to be pulled over every time he leaves home because everyone knows fraternity houses are rife with alcohol.

The majority says that Officer Miller testified that he believed that Appellant was driving while intoxicated because of the time of night, her driving, the area of the city that she had been coming from, and his experience with intoxicated drivers exhibiting similar driving characteristics.[2] But Officer Miller actually testified that it was less the time of night than the fact that it was night:

> Q. But, nevertheless, it's not in your report what time it was or —it doesn't—your report is not reflective of—
>
> A. I think it's fair to say that the number of impaired drivers increase[s] in the nighttime hours especially leaving an area of the City that has several bars or restaurants that—if you will, that serve alcohol.

---

[2] ▲ *Id.*

3

Our sister court in Austin was faced with a similar set of circumstances in *Foster v. State*.[3] First, the *Foster* court noted,

> While the Court of Criminal Appeals no longer employs the "as consistent with innocent activity as with criminal activity" test for reasonable suspicion, the plausibility of an innocent explanation in this case affects our determination of whether there was a reasonable basis for suspecting that Foster was intoxicated.[4]

With that caveat in mind, I would look at the trial court's determination of credibility; that is, the trial court's findings of fact. Officer Miller testified that he pulled Appellant over because he saw her commit a traffic violation. But he was mistaken. What he observed was not a violation of the law. As this court has previously explained, reasonable suspicion of an alleged traffic violation cannot be based on a police officer's mistaken understanding of traffic laws.[5]

As the *Foster* court posited, "*In the absence of a traffic offense, was there reasonable suspicion of intoxication*?"[6] A reviewing court must determine whether "the combined weight of [the] circumstances is . . . so much greater than the aggregation of their individual weights that it allows for a rational inference of

---

[3] 297 S.W.3d 386 (Tex. App.—Austin 2009, pet. granted).

[4] *Id.* at 393 (citing *Curtis v. State*, 238 S.W.3d 376, 379 (Tex. Crim. App. 2007)).

[5] *Fowler v. State*, 266 S.W.3d 498, 504 (Tex. App.—Fort Worth 2008, pet. ref'd); *see United States v. Granado*, 302 F.3d 421, 423 (5th Cir. 2002).

[6] 297 S.W.3d at 393.

intoxication."[7] The majority points out that the trial court found no traffic violation, no unsafe driving, very light traffic, and no erratic speed changes.[8]

The majority then properly addresses the remaining justifications for the detention.

**1.  Time of night.**  "Time of day, by itself, is 'owed virtually no weight' as a factor in determining reasonable suspicion."[9]

**2.  Leaving a bar area.**  Actually, Officer Miller did not see Appellant leaving a bar area but, rather, driving on a freeway/major state highway that was routed through an area that had some bars and restaurants.  He did not observe her leaving any parking lot or even driving on a roadway other than Highway 183 with limited ingress and egress.  He did not observe her at any point before she was driving on Highway 183.  As the *Foster* court stated, "[L]ocation is generally 'an insufficient basis for a rational inference that would lead to a reasonable suspicion.'"[10]

---

[7] *Id.* (citing *State v. Thirty Thousand Six Hundred Sixty Dollars & No/100*, 136 S.W.3d 392, 400 (Tex. App.—Corpus Christi 2004, pet. denied)).

[8] Majority op. at 4.

[9] *Foster*, 297 S.W.3d at 393 (quoting *Thirty Thousand Six Hundred Sixty Dollars & No/100*, 136 S.W.3d at 400).

[10] *Id.* (quoting *Thirty Thousand Six Hundred Sixty Dollars & No/100*, 136 S.W.3d at 401).

**3. Crossing on to the shoulder of the roadway, once by one-half the width of the vehicle and a second time by a few inches and "[u]nusual use of turn signal."**

The trial court correctly concluded that the record reveals that Appellant committed no traffic offense.[11] Was the use of the turn indicator, combined with the other circumstances, sufficient to provide reasonable suspicion to detain Appellant? Officer Miller suggested that he thought that Appellant's signal was a violation of the law.

Section 545.104(b) of the transportation code provides in pertinent part that "[a]n operator intending to turn a vehicle right or left shall signal continuously for not less than the last 100 feet of movement of the vehicle before the turn."[12] The statute does not provide for a maximum distance beyond which a person may not signal a turn, only a minimum distance. Officer Miller did not see Appellant violate the law by engaging her turn indicator more than 100 feet before changing lanes or exiting the freeway.

> An officer's reasonable suspicion of an alleged traffic violation cannot be based on a mistaken understanding of traffic laws. And an officer's honest but mistaken understanding of the traffic law which prompted a stop is not an exception to the reasonable suspicion requirement.[13]

---

[11] *See Fowler*, 266 S.W.3d at 504–05; *State v. Huddleston*, 164 S.W.3d 711, 716 (Tex. App.—Austin 2005, no pet.).

[12] Tex. Transp. Code Ann. § 545.104(b) (Vernon 1999).

[13] *Fowler*, 266 S.W.3d at 504 (citations omitted).

6

The issue, then, is whether the non-violation was a circumstance providing, in light of all the circumstances, reasonable suspicion for Officer Miller to stop Appellant. This question requires close examination of the videotape.

The videotape shows that when Appellant first engaged her turn signal, there was a traffic lane to her right and a sign indicating the Harwood exit from the freeway. After she engaged the turn indicator, it became clear that the lane to her right merged into the lane she was in. At this point she had a choice to make. She could disengage the turn indicator, and then immediately re-engage it in order to signal her intent to exit the freeway, or she could leave the turn indicator on. Was one choice really so much more rational than the other that to make the other choice indicated intoxication? Was her decision not to flick the indicator off and then immediately on even unreasonable?

The detention cannot be justified by the fruits of the detention. The reasonable suspicion for the stop must exist at the time the officer exercises a show of authority and the suspect indicates an intent to or actually acquiesces to the show of authority.[14] Officer Miller engaged his overhead lights before Appellant exited the freeway.

I would hold that the combined circumstances of Officer Miller's seeing Appellant's vehicle traveling at 12:25 a.m. on a limited ingress/egress major highway

---

[14] *St. George v. State*, 237 S.W.3d 720, 725–26 (Tex. Crim. App. 2007) (citing *Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S. Ct. 1868, 1878–79 (1968)).

through an area containing bars and restaurants, seeing the vehicle's tires crossing or touching the right lane line twice, and seeing Appellant indicating her exit from the freeway for more than 100 feet do not provide reasonable suspicion to believe that Appellant was committing the offense of DWI. I would hold, therefore, that the State did not sustain its burden of proving that the warrantless stop was lawful, and I would further hold that the trial court abused its discretion by denying Appellant's motion to suppress the fruits of the stop. Because the majority does not, I must respectfully dissent.

LEE ANN DAUPHINOT
JUSTICE

PUBLISH

DELIVERED: March 11, 2010

8