**Raymond Earl VINSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**Nos. 01–05–00784–CR, 01–05–00785–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 10, 2006.

Discretionary Review Granted
March 21, 2007.

Dionne S. Press, Houston, TX, for Appellant.

Charles A. Rosenthal, Jr., District Attorney, Harris County, Alan Curry, Assistant District Attorney, Houston, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices TAFT and NUCHIA.

## OPINION

TIM TAFT, Justice.

A jury convicted appellant, Raymond Earl Vinson, of assault on a household or family member and interference with an emergency telephone call. *See* TEX. PEN. CODE ANN. §§ 22.01(a)(1), (b)(2), 42.062(a) (Vernon 2003). After appellant had pleaded true in the assault case to an enhancement allegation that he had previously been convicted of murder,[1] the trial court assessed appellant's punishment at 365 days in jail and a $500 fine for both cases, with jail time to run concurrently. *See id.* §§ 12.21, 12.43(a) (Vernon 2003). We determine (1) whether the trial court erred in admitting the hearsay statements of the complainant, Lalania Hollimon, under the excited-utterance exception to the hearsay-exclusionary rule; (2) whether appellant preserved a Confrontation Clause challenge to the admission of a 9–1–1 dispatch operator's hearsay statements; and (3) whether the trial court violated the Confrontation Clause by admitting Hollimon's same hearsay statements described above. *See* U.S. CONST. amends. VI, XIV. We affirm the judgment.

## Background

In trial court cause number 1273452 (appellate cause number 01–05–00785–CR),

appellant was charged with the Class A misdemeanor offense of assault on a household or family member. *See* TEX. PEN.CODE ANN. § 22.01(a)(1), (b)(2). In trial court cause number 1289313 (appellate cause number 01–05–00784–CR), appellant was charged with the Class A misdemeanor offense of interference with an emergency telephone call. *See id.* § 42.062(a). The two cases were tried together.

During trial, the State offered the testimony of Deputy Chapman, the officer who had responded to a report by a 9–1–1 dispatch operator of a possible emergency in appellant and Hollimon's apartment. Over appellant's objection on the ground of lack of personal knowledge, the trial court allowed Deputy Chapman to testify to what the 9–1–1 dispatcher had told him about two 9–1–1 calls. The dispatcher's statements to the deputy were as follows. A 9–1–1 hang-up call was made from appellant and Hollimon's apartment. The 9–1–1 dispatch operator returned that interrupted call to inquire whether there was an emergency. A male answered the return call and responded that there was no emergency. However, the dispatch operator could hear a "disturbance in the background" and "somebody yelling" for police assistance.

Ten to fifteen minutes passed from the time that the initial 9–1–1 hang-up call was made to the time of Deputy Chapman's arrival at appellant and Hollimon's apartment. When Hollimon answered the door, she "had injuries to her face"; her injuries appeared to be recent; she appeared to be in pain; and she was "visibly shaken," "shaking," "a little excited," and "scared." Hollimon was also "moaning about"; "her

---

1. The State did not seek to enhance punishment in appellant's interference-with-an-emergency-telephone-call conviction.

lips were swollen"; there were "some abrasions on her"; she had a deep, one-to-two-inch, "severe" cut to her lower lip that would probably have to be stitched by medical personnel; "she had a towel on her face"; there "was blood on the towel"; and "it was obvious ... that the injuries that she sustained [were] still in effect." In addition, the apartment was in disarray, and there was blood on the floor.

Upon Deputy Chapman's initial inquiry of, "[W]hat happened[?]," Hollimon "advised [Deputy Chapman] that she was assaulted" by her boyfriend. Appellant then objected to hearsay and to "any further testimony about what Ms. Hollimon said" on the basis of the Confrontation Clause and *Crawford*.[2] The trial court overruled appellant's objections, but allowed appellant running objections to the deputy's testimony of Hollimon's statements. Deputy Chapman then testified as follows:

Deputy: Well, I asked ... what happened.... [S]he described to me that she was assaulted by her boyfriend. And I began to question her about the assault. And, during the questioning ... a black male came from the living room area, and was saying, "Tell him the truth. Tell him the truth." And, ... this male came out and he ... had no shirt on. And, he was sweating profusely. At that point, I asked her who he was[.] She described him as her boyfriend. Or, common

law spouse. And, told me that his name was "Vinson." And, he was the person [who] assaulted her.

When appellant entered the room, he "was very excited," was shirtless, was sweating profusely, had no visible injuries, and demanded that Hollimon "[t]ell [the deputy] the truth" so that appellant would not be taken to jail. Apparently while appellant was still present,[3] Hollimon told the deputy that she and appellant, who had been living together, had been having problems; that appellant had decided to move out; that appellant had become angry while packing; that they had begun arguing; that appellant had punched her in the face while she lay on the living room couch; that appellant had knocked or taken the phone from her hand when she had tried to call 9-1-1; that she had then run to the kitchen; that appellant had begun removing his belt in the kitchen as if to whip her, although he did not do so; that they had struggled in the kitchen; and that he had then whipped her with an extension cord.

Deputy Chapman secured appellant and placed him in the back of his patrol car. At that point, Deputy Chapman called his partner for back-up. When the partner arrived, he took pictures of Hollimon's injuries, as well as of the apartment, which was in disarray.

Neither Hollimon nor the 9-1-1 dispatch operator testified at trial. Appellant asserts three points of error on appeal:

---

**2.** *See Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

**3.** Deputy Chapman restrained appellant and removed him to the patrol car at some point in his investigation. However, the record is somewhat unclear as to exactly when appellant was removed from the apartment. Deputy Chapman's testimony could be read to indicate either (1) that Hollimon had made all of

the complained-of statements before appellant was removed, and that the deputy continued interviewing her on undisclosed matters after appellant's arrest, or (2) that she had made only the identification of appellant as her assailant before he was removed, with the remaining complained-of statements following his removal. We explain below why we must adopt the first interpretation of the evidence.

1. The trial court erred in allowing Hollimon's statements into evidence, through Deputy Chapman's testimony, under the excited-utterance exception to the hearsay-exclusionary rule;
2. The trial court erred in allowing the 9–1–1 dispatcher's statements into evidence, through Deputy Chapman's testimony, because doing so violated the Confrontation Clause; and
3. The trial court erred in allowing Hollimon's statements into evidence, through Deputy Chapman's testimony, because doing so violated the Confrontation Clause.

## The Excited–Utterance Exception to the Hearsay Rule

■ In his first point of error, appellant argues that the trial court erred in allowing Deputy Chapman to testify, under the excited-utterance exception to the hearsay-exclusionary rule, to what Hollimon had told him when he investigated the 9–1–1 calls.

■ A trial court has broad discretion in determining whether evidence is admissible as an exception to the hearsay-exclusionary rule. *See Zuliani v. State,* 97 S.W.3d 589, 595 (Tex.Crim.App.2003); *Kubin v. State,* 868 S.W.2d 394, 396 (Tex. App.-Houston [1st Dist.] 1993, pet. ref'd). A trial court's decision to admit or to exclude hearsay will not be reversed unless the trial court committed an abuse of discretion. *Zuliani,* 97 S.W.3d at 595 (citing *Coffin v. State,* 885 S.W.2d 140, 149 (Tex.Crim.App.1994)); *see Lawton v. State,* 913 S.W.2d 542, 553–54 (Tex.Crim. App.1995) (citing *Smith v. State,* 683 S.W.2d 393, 404 (Tex.Crim.App.1984)). If a trial court's action falls within the " 'zone of reasonable disagreement,' " the reviewing court is bound to abide by the trial

court's decision. *Salazar v. State,* 38 S.W.3d 141, 153–54 (Tex.Crim.App.2001) (quoting *Montgomery v. State,* 810 S.W.2d 372, 390–91 (Tex.Crim.App.1990) (op. on reh'g)).

■ An excited utterance, one of the exceptions to the hearsay-exclusionary rule, is "[a] statement relating to a startling event or condition made while the declarant [is] under the stress of excitement caused by the event or condition." Tex.R. Evid. 803(2). "The basis underlying the admission of this class of evidence is a psychological one, namely, the fact that when a man is in the instant grip of violent emotion, excitement or pain, he ordinarily loses the capacity for reflection necessary to the fabrication of a falsehood and the 'truth will out.' " *Evans v. State,* 480 S.W.2d 387, 389 (Tex.Crim.App.1972). That is, "the statement is trustworthy because it represents an event speaking through the person rather than the person speaking about the event." *Zuliani,* 97 S.W.3d at 595. Accordingly, "the critical determination is 'whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event' or condition at the time of the statement." *Id.* at 596 (quoting *McFarland v. State,* 845 S.W.2d 824, 846 (Tex.Crim.App.1992)). Other factors that the court may consider include the length of time between the occurrence and the statement and whether the statement was made in response to questioning; however, these factors are not dispositive. *See id.* at 595–96; *Penry v. State,* 903 S.W.2d 715, 750–51 (Tex. Crim.App.1995); *Lawton,* 913 S.W.2d at 553.

We hold that the trial court acted within its discretion in implicitly concluding that all of Hollimon's complained-of statements to Deputy Chapman were excited utterances and thus not excluded by the hearsay-exclusionary rule. When considered

in the light required by the abuse-of-discretion standard of review, the record is replete with descriptions of Hollimon as "visibly shaken," "excited," and "scared," as well as recently injured and bloody, when she spoke to Deputy Chapman. The record also establishes that only 10 to 15 minutes had elapsed from the time of the initial 9–1–1 call to the time that Deputy Chapman arrived on the scene and encountered Hollimon. Given these facts, the trial court could reasonably have concluded that Hollimon was still dominated by the emotions of her attack when she made the statements to Deputy Chapman. *See Zuliani,* 97 S.W.3d at 595–96; *Cantu v. State,* 842 S.W.2d 667, 682 (Tex.Crim.App. 1992). Therefore, we hold that the trial court did not abuse its discretion by admitting into evidence, as an excited utterance, the testimony of Deputy Chapman regarding statements made to him by Hollimon. *See* Tex.R. Evid. 803(2).

We overrule the first point of error.

### Confrontation Clause

In his second and third points of error, appellant argues that the trial court violated his Sixth Amendment right to confront witnesses against him when it admitted into evidence, through the testimony of Deputy Chapman, out-of-court statements made by the 9–1–1 dispatch operator and Hollimon.

### A. The 9–1–1 Dispatch Operator's Statements

■ We need not reach the merits of appellant's third point of error, which asserts that the trial court violated the Con-

frontation Clause when it allowed Deputy Chapman to testify to the dispatch operator's statements, because appellant's trial counsel failed to preserve error. *See* Tex. R.App. P. 33.1(a). Appellant's trial counsel objected to the testimony of Deputy Chapman regarding statements made by the dispatch operator on the ground of lack of personal knowledge, not on the ground of a violation of the Confrontation Clause. When the appellate complaint fails to comport with the trial objection, nothing is preserved for review. *See Swain v. State,* 181 S.W.3d 359, 367 (Tex.Crim.App.2005); *Schultze v. State,* 177 S.W.3d 26, 41 (Tex. App.-Houston [1st Dist.] 2005, pet. ref'd); *see also Reyna v. State,* 168 S.W.3d 173, 179 (Tex.Crim.App.2005) (explaining that when objection is not sufficiently specific and can be construed as falling under either Rules of Evidence or Confrontation Clause, objection is not preserved for appeal). Even after *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the U.S. Supreme Court's seminal opinion construing the Confrontation Clause, one must still preserve such a challenge for appeal. *Campos v. State,* 186 S.W.3d 93, 98 (Tex.App.-Houston [1st Dist.] 2005, no pet.) (holding that defendant waives appellate challenge based on Confrontation Clause, even after *Crawford,* for failure to object at trial); *see also Bunton v. State,* 136 S.W.3d 355, 369 (Tex.App.-Austin 2004, pet. ref'd) (holding that there is "nothing in *Crawford* that would excuse appellant for failing to make a confrontation claim at trial"). Accordingly, we hold that appellant waived this challenge on appeal.[4] *See Campos,* 186

4. When the State offered the 9–1–1 tape into evidence later on, the trial court overruled appellant's objection to the tape on Confrontation Clause grounds. However, that objection came too late to preserve a Confrontation Clause objection to Deputy Chapman's earlier testimony. *See* Tex R.App P. 33.1(a)(1) (requiring that complaint be "timely"); *Penry v. State,* 903 S.W.2d 715, 763 (Tex.Crim.App. 1995) ("To be timely, an objection must be raised at the earliest opportunity or as soon as the ground of objection becomes apparent.").

S.W.3d at 98; *see also* Tex.R.App. P. 33.1(a).

We overrule the third point of error.

### B. Hollimon's Statements

In his second point of error, appellant argues that the trial court violated the Confrontation Clause by admitting Hollimon's out-of-court statements.

■ The applicable provision of the Sixth Amendment, often referred to as the Confrontation Clause, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. The right to confront adverse witnesses is available in federal and state prosecutions. *See Pointer v. Texas,* 380 U.S. 400, 406, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923 (1965). Our standard of review in this case, which involves some ambiguous historical facts and their application to the law, is mixed: "Although we defer to a trial court's determination of historical facts and credibility, we review a constitutional legal ruling, *i.e.* whether a statement is testimonial or non-testimonial, *de novo.*" *Wall v. State,* 184 S.W.3d 730, 742 (Tex.Crim.App.2006); *see also Lilly v. Virginia,* 527 U.S. 116, 137, 119 S.Ct. 1887, 1900, 144 L.Ed.2d 117 (1999) (stating that courts should "independently review" whether out-of-court statements violate Confrontation Clause).

#### 1. The Law: Testimonial Statements

The U.S. Supreme Court has interpreted the Confrontation Clause to prohibit a witness from recounting a declarant's out-of-court statements that are testimonial unless (1) the declarant is unavailable to testify and (2) the defendant had a prior opportunity to cross-examine the declarant regardless of whether the declarant's statements are deemed reliable by the court. *See Crawford,* 541 U.S. at 68, 124 S.Ct. at 1374; *accord Wall,* 184 S.W.3d at 734–35 (citing *Crawford,* 541 U.S. at 68, 124 S.Ct. at 1374).

The *Crawford* Court declined to give a comprehensive definition of what constituted testimonial statements. *See Crawford,* 541 U.S. at 67, 124 S.Ct. at 1374. However, the Court explained that the Confrontation Clause's focus on testimonial hearsay "applies to 'witnesses' against the accused—in other words, those who 'bear testimony[ ]' " and that " '[t]estimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " *Id.* at 51, 124 S.Ct. at 1364 (quoting 2 N. Webster, An American Dictionary of the English Language (1828); brackets in original). The Court also explained that "testimonial" applies "at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and [responses] to police interrogations." *Id.* "Interrogation" refers not to the legal interpretation of the term, but, rather, to the term's colloquial application. *Id.* at 53 n. 4, 124 S.Ct. at 1365 n. 4. The *Crawford* Court also indicated that a "core class of 'testimonial' statements" exists: (1) ex parte in-court testimony, (2) affidavits, (3) depositions, (4) confessions, (5) custodial examinations, and (6) statements made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial. *Id.* at 51, 124 S.Ct. at 1364; *accord Wall,* 184 S.W.3d at 735 n. 11 (citing *Crawford* and also noting that this final (and broadest) category of what can constitute "testimonial" is one on

---

Additionally, we note that appellant does not complain of the 9–1–1 tape's admission on appeal.

which lower courts rely most heavily to ensure compliance with Confrontation Clause); *Campos*, 186 S.W.3d at 97.

Since *Crawford*, many courts across the country have struggled with what constitutes a "testimonial" statement. *See Wall*, 184 S.W.3d at 737. Very recently, however, the Supreme Court has clarified what "testimonial" means:

> Without attempting to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington*, — U.S. —, ——–——, 126 S.Ct. 2266, 2273–74, 165 L.Ed.2d 224 (2006);[5] *accord Cook v. State*, 199 S.W.3d 495, 497 (Tex.App.-Houston [1st Dist.] 2006, no pet. h.) (quoting and following *Davis*, 126 S.Ct. at 2273–74). The *Davis* Court applied this standard to two statements: statements made about the contents of a 9–1–1 call and statements made to officers who arrived at the scene of a reported domestic dispute. *See Davis*, — U.S. —, 126 S.Ct. 2266, 165 L.Ed.2d 224 *passim*. The 9–1–1 state-

ments were made in response to the operator's preliminary questions asking, for example, what was happening, whether weapons were used, and who the assailant was. *Id.* at 2271. The at-the-scene statements, also preserved in an affidavit made by the complainant, were made at a time when there appeared to be no emergency and after the assailant and the complainant had been separated. *Id.* at 2271–73.

The Court first held that the 9–1–1 caller's statements were not testimonial because the circumstances of the operator's interrogation "objectively indicate[d] its primary purpose was to enable police assistance to meet an ongoing emergency." *Id.* at 2277. In support of this holding, the *Davis* Court identified several indicators of the statements' non-testimonial nature:

- the 9–1–1 declarant was "speaking about events *as they were actually happening*," rather than simply describing past events, as had been the case in the station-house interview in *Crawford*;
- "any reasonable listener would recognize" that the 9–1–1 declarant "was facing an ongoing emergency";
- "the nature of what was asked [of] and answered [by]" the 9–1–1 declarant, "viewed objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn ... what had happened in the past"; and
- "the difference in the level of formality between" the interviews of the 9–1–1 declarant and the declarant in *Crawford* was "striking" because, unlike in *Crawford*, the 9–1–1 declarant's

---

**5.** The *Davis* opinion was actually issued in two causes that had been consolidated: *Hammon v. Indiana*, No. 05–5705, and *Davis v. Washington*, No. 05–5224. *See Davis v. Washington*, — U.S. —, 126 S.Ct. 2266,

165 L.Ed.2d 224 *passim* (2006). For simplicity's sake, we refer to the Court and its consolidated opinion as *Davis*, regardless of in which cause the cited holdings were rendered.

"frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe."

*Id.* at 2276–77 (emphasis in original). The *Davis* Court cautioned, however, that "a conversation which begins as an interrogation to determine the need for emergency assistance" can evolve into testimonial statements "once that purpose has been achieved." *Id.* at 2277.

In contrast, the Court held that the at-the-scene statements were testimonial. *Id.* at 2278. In support of this second holding, the Court reasoned that

[i]t is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct.... There was no emergency in progress; the interrogating officer testified that he had heard no arguments or crashing and saw no one throw or break anything.... When the officers first arrived, [the complainant] told them that things were fine ..., and there was no immediate threat to her person. When the officer questioned [her] for the second time, and elicited the challenged statements, he was not seeking to determine ... "what is happening," but rather "what happened." Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime....

*Id.* Likening the statement before it to that in *Crawford,* the Court noted:

Both declarants were actively separated from the defendant.... Both statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed. And both took place some time after the events described were over. Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial.

*Id.* (emphasis in original). Simply put, the complainant's at-the-scene statements "were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation." *Id.* at 2279. Finally, although the Court necessarily rejected the lower court's "implication that virtually any 'initial inquiries' at the crime scene will not be testimonial," the Court cautioned that it was not holding "the opposite—that *no* questions at the scene will yield nontestimonial answers." *Id.* (emphasis in original).

In general, the *Davis* Court cautioned that "statements made in the absence of any interrogation are [not] necessarily nontestimonial." *Id.* at 2274 n. 1. The Court also explained that "even when interrogation exists, it is in the final analysis the declarant's statements, not the interrogator's questions," that the Confrontation Clause requires courts to evaluate. *Id.*

### 2. Application of the Law to the Facts

#### a. Hollimon's Initial Statements Identifying Appellant as Her Assailant

■ We conclude that the initial statements that Hollimon made to Deputy Chapman upon his arrival at the scene were not testimonial under *Davis* or *Crawford.* These initial statements included Hollimon's identifying her boyfriend as the assailant and her identifying the man who entered the living room while she spoke with Deputy Chapman as that boyfriend. We reach this conclusion for the following reasons.

First, Deputy Chapman arrived within 10 to 15 minutes of the 9–1–1 calls' having been placed. The 9–1–1 call that had originally been placed was disconnected, and

when the dispatcher had called the number back, the male who answered denied that there was an emergency, while someone in the background was yelling for police assistance. Deputy Chapman knew this information when he went to the residence. When Hollimon answered the door, she was bloody and appeared recently injured, and the apartment was in disarray. It was against this backdrop that the deputy asked Hollimon simply, "[W]hat happened[?]" Her reply was that her boyfriend had assaulted her. Given Hollimon's bloodied appearance—and given that the deputy knew that, only minutes before, a woman in that same apartment had been yelling for police assistance while a man denied that any problem existed— the deputy's asking only what had happened was tantamount to his having asked whether an emergency existed or whether Hollimon needed assistance. The Confrontation Clause does not prohibit questioning when, as here, its purpose, viewed objectively, is to ascertain if there is an ongoing emergency. *See Davis,* 126 S.Ct. at 2276.

■ Furthermore, during the deputy's subsequent questioning (the extent and formality of which is not revealed), appellant—who was sweating profusely, shirtless, and "very excited"—entered the room and implicitly ordered Hollimon to answer in a certain way so that he would not be taken to jail. Given Hollimon's and appellant's appearance and the other circumstances set out herein, Deputy Chapman's asking Hollimon to identify the entering male, when viewed objectively, indicated that the "elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn . . . what had happened in the past." *Id.*

(emphasis in original); *cf. Spencer v. State,* 162 S.W.3d 877, 883 (Tex.App.-Houston [14th Dist.] 2005, pet. ref'd) (holding, in case predating *Davis,* that bloodied and distraught victim's initial statements to officers, who were responding to 9–1–1 hang-up call, were not testimonial under *Crawford* when record did not show whether statements were made in response to police questioning and when only question that record showed was asked was one designed to ensure safety of those at scene).

**b. Hollimon's Remaining Statements**

■ Hollimon's remaining statements were that appellant and Hollimon had lived together, that appellant had been ready to move from the apartment and had become angry while packing, and that appellant had interrupted her 9–1–1 call. Also included in those statements was Hollimon's description of precisely how appellant had assaulted her.

We hold that Hollimon's remaining statements were nontestimonial. We reach this conclusion although the record implies that at least some of those statements were made in response to further questioning beyond the deputy's initial query asking what had happened.[6] We base our holding on the following facts.

First, we deem the trial court implicitly to have concluded that appellant was still present when Hollimon made these remaining statements. Our bifurcated standard of review requires us to defer to the trial court's implicit determination of the historical facts. *See Wall,* 184 S.W.3d at 742. Given the trial court's legal ruling and the fact that appellant's continued presence during Hollimon's remaining statements would have supported that rul-

---

6. Deputy Chapman remarked that, after Hollimon stated that her boyfriend had assaulted her, he "began to question her about the assault" and that appellant entered the room during that "questioning."

ing (as we discuss below), we deem the trial court implicitly to have determined that appellant was present during the making of all of Hollimon's remaining statements. *See id.* The historical facts supporting such an implicit determination are contained in the deputy's testimony, in which he related that *after* he had arrested appellant, he did a *"further* interview" with Hollimon (the substance of which was not revealed), which "reaffirmed" what "had happened" (*i.e.,* the events that she had already related to him). (Emphasis added.) The overall order in which the deputy related what had happened and what Hollimon had told him also supports that appellant was present during the entirety of Hollimon's remaining statements. We thus conclude that the record must be construed as indicating appellant's presence during all of Hollimon's remaining statements. *See id.*

Second, Hollimon appeared recently and badly injured, and she identified the man in the room (appellant) as her assailant. That assailant, who was present during Hollimon's remaining statements, was still "very excited" and was implicitly ordering Hollimon to answer in a certain way so that he would not be taken to jail. These facts, which objectively indicated an ongoing and dangerous situation, render the situation here very different from that in *Davis,* in which the assailant was not present during the interview and, clearly, no emergency existed any longer. *See Davis,* 126 S.Ct. at 2278 (basing holding that victim's hearsay statements were testimonial in part on fact that no emergency or immediate threat existed any longer, victim had told officers that everything was fine, and assailant had been separated from victim when statements were made).

Third, the deputy responded affirmatively to a question asking whether *"in assessing the situation,* and in your training and experience—[the deputy was] trained . . . to look at the [alleged assailant] . . . to see if they [sic] have any visual wounds" that might comport with the victim's description of the assaultive event. (Emphasis added.) Fourth, Deputy Chapman felt that it was only after his partner—for whom the deputy called when appellant was placed in the patrol car—had arrived and after the scene had been secured that he "felt safe that nothing else was going to occur." Fifth, the record simply does not reveal what the deputy's questions were; how structured, formal, or informal his questioning was; or how many questions he asked in order to elicit Hollimon's later statements. Finally, the apartment was not photographed, the deputy did not call for medical personnel to examine Hollimon, and the deputy did not question Hollimon further until after the complained-of statements had been made and appellant had been secured. *Compare Wall,* 184 S.W.3d at 744–45 (indicating that court's conclusion that hearsay statements' admission violated Confrontation Clause was bolstered by fact that police photographs of officer's interviewing declarant evidenced that investigation was occurring, rather than response to emergency).

Given Deputy Chapman's affirmative response to a query as to whether he was still assessing the situation when Hollimon was answering his questions, appellant's continued and excited presence in the room and his implicitly pressuring Hollimon to answer in a certain way, the deputy's opining that the scene did not feel safe until after appellant had been secured and back-up had arrived (both of which occurred after the complained-of statements had been made), and the extent of Hollimon's injuries from the earlier assault, one could objectively conclude that, by Deputy Chapman's questioning Hollimon at that stage, the deputy was continuing to assess the situation to see if Hollimon was still

potentially in danger and needed police assistance and whether back-up assistance or securing appellant was required.

Therefore, although these statements concerned past events and were likely in response to further questioning by Deputy Chapman, we hold that they were nontestimonial because they occurred under the circumstances set out above, which "objectively indicat[ed] that the primary purpose of the interrogation [was] to enable police assistance to meet an ongoing emergency." *Davis*, 126 S.Ct. at 2276.

### 3. Summary

Because we have held that the trial court did not err in overruling appellant's Confrontation Clause objection to Deputy Chapman's testimony of any of Hollimon's statements, we overrule appellant's second point of error.

### Conclusion

We affirm the judgment of the trial court.