**Pamela LONG, Appellant**

v.

**UNITED STATES, Appellee.**

**No. 03–CM–10.**

District of Columbia Court of Appeals.

Argued Dec. 14, 2004.
Decided Nov. 15, 2007.
As Amended on Denial
of Rehearing Feb. 28, 2008.

---

Enid Hinkes, appointed by the court, for appellant.

Andrea Roth, with whom James Klein and Samia Fam were on the brief and supplemental briefs, for the Public Defender Service as amicus curiae.

Valinda Jones, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, Kenneth L. Wainstein, United States Attorney at the time the first supplemental brief was filed, Jeffrey A. Taylor, United States Attorney at the time the second supplemental brief was filed (and currently), John R. Fisher, Assistant United States Attorney at the time the brief and first supplemental brief were filed, and Roy W. McLeese, III, Mary B. McCord, and Eric P. Gallun, Assistant United States Attorneys, were on the brief and supplemental briefs, for appellee.

Before WASHINGTON, Chief Judge, and WAGNER and TERRY, Senior Judges.*

---

* Judge Washington was an Associate Judge of the court at the time of argument. His status changed to Chief Judge on August 6, 2005.

Judge Wagner was Chief Judge of the court at the time of argument. Her status changed to Senior Judge on December 21, 2005.

TERRY, Senior Judge:

This is an appeal from a conviction of assault. Appellant Long, with support from *amicus curiae,* the Public Defender Service, seeks reversal based on, *inter alia,* the recent Supreme Court decision in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Appellant and *amicus* contend that certain out-of-court hearsay statements that were admitted into evidence at trial violated the Confrontation Clause as interpreted by the Court in *Crawford.* Appellant also maintains that the evidence presented was insufficient to support her conviction, that the government failed to prove that the offense took place in the District of Columbia, and that the trial court improperly questioned witnesses. We affirm.

I

On July 26, 2002, at approximately 1:00 p.m., Officer Christopher James was driving in a marked police cruiser when a man on the sidewalk flagged him down. This man, later identified as Jeffrey Dunn, was bleeding from a laceration on his face that stretched from his forehead to his chin and was about a quarter-inch wide. Mr. Dunn, who was "covered in blood" despite having a towel in his hand to help stop the bleeding, was extremely upset and "hyper." Officer James asked, "What happened?" and "Who did this to you?" Mr. Dunn did not respond directly, but instead paced up and down the sidewalk while emphatically repeating, "Look what she did to my face." Officer James called for a paramedic unit and for backup assistance. Officer Reuben Jefferson responded to the backup request within a minute, and the paramedics arrived shortly thereafter. Upon Officer Jefferson's arrival, Mr. Dunn said, "Look what the bitch done, she cut my face."

An ambulance arrived very soon thereafter. Mr. Dunn sat in it for a few moments while the paramedics tried to convince him to go to the hospital for treatment, but he refused to go. After getting out of the ambulance, Mr. Dunn saw appellant coming out of a nearby alley and exclaimed, "There she is!" He then said something to appellant which the officers could not hear, to which appellant replied, "You hit me in my stomach, you beat me, you slashed my tires. I'm tired of you beating me." Mr. Dunn and appellant then began to argue, and Officer Jefferson separated them. Appellant had no visible injuries.

The next day appellant was charged with one count of assault [1] and one count of attempted possession of a prohibited weapon.[2] A few months later, the case came before the court for a non-jury trial. Mr. Dunn did not testify at the trial, so the government, through the testimony of police officers, introduced the three statements that he had made at the scene. The first was Dunn's "Look what she did to my face" statement to Officer James, which he had repeated three times. The court admitted that statement over appellant's objection on hearsay grounds as an excited utterance. The second statement was Dunn's "Look what the bitch done, she cut my face," which Officer Jefferson heard. This was also admitted as an excited utterance, again over appellant's hearsay objection.[3] The third statement was Mr.

---

Judge Terry was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on February 1, 2006.

1. D.C.Code § 22–404 (2001).

2. D.C.Code §§ 22–4514(b), 22–1803 (2001).

3. *Amicus* argues that the first and second statements ("Look what she did to my face" and "Look what the bitch done, she cut my face") were actually the same statement but

Dunn's exclamation "There she is!" which was admitted without objection.

Appellant testified that she did not intend to cut Mr. Dunn, but had merely swung at him with her fist in self-defense. At the end of the trial, the court found appellant guilty of assault but acquitted her of the weapon charge.

Appellant filed a timely notice of appeal. After the briefs were filed, the case was submitted without argument. Shortly thereafter, however, the Supreme Court of the United States issued its decision in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Appellant filed a motion to allow supplemental briefing in light of *Crawford*, which we granted without opposition. Appellant, appellee, and *amicus* Public Defender Service filed briefs discussing the issues raised by *Crawford*, and the court in due course heard oral argument. Thereafter, while the case was still pending, the Supreme Court decided *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), in which it amplified its earlier holding in *Crawford*. At the parties' request, the court agreed to further briefing on the impact of the *Davis* decision and other "recent decisions of this court," particularly *Thomas v. United States*, 914 A.2d 1 (D.C.2006). The last of these additional supplemental briefs were filed in August 2007, and this appeal is now ready for decision.

## II

### A. *No Plain Error*

■ Appellant's main contention is that her conviction should be reversed because the admission of Mr. Dunn's three statements in evidence violated her rights under the Confrontation Clause of the Sixth Amendment. Although appellant did object to two of these statements as hearsay, she did not object on Confrontation Clause grounds to the admission of any of the three; consequently, we may consider her present contention only as a claim of plain error. *See Marquez v. United States*, 903 A.2d 815, 817 (D.C.2006). "[B]efore an appellate court can correct an error not raised at trial, there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affects substantial rights.' " *Johnson v. United States*, 520 U.S. 461, 466–467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (citation omitted). *Johnson* also tells us that "where the law at the time of trial was settled and clearly contrary to the law at the time of appeal—it is enough that an error be 'plain' at the time of appellate consideration." *Id.* at 468, 117 S.Ct. 1544. Accordingly, we must review the trial court's admission of Mr. Dunn's hearsay statements for plain error under the new interpretation of the Confrontation Clause articulated for the first time in *Crawford*.

■ When an error is "plain" as that term is used by the Supreme Court, in order to merit reversal, it not only must affect "substantial rights," but also must "seriously [affect] the fairness, integrity, or public reputation of judicial proceedings." *Johnson*, 520 U.S. at 467, 117 S.Ct. 1544 (quoting *United States v. Olano*, 507 U.S. 725, 731–732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). In this case, it is by no means clear that the alleged error fits within that class of cases in which substantial rights are affected. Even if the two hearsay statements to which appellant objected had not been admitted at trial, Dunn's third statement, "There she is," referring to appellant when she appeared on the scene, would have been admitted.

were remembered differently by the two officers. We need not decide this point, because whether there was one statement or two has no material effect on our holding.

Further, appellant's own statements as heard by the police officers, which appear to explain her motive for the assault, would also have been admitted. Additionally significant is the fact that appellant chose to testify in her own behalf, acknowledging that she had assaulted Mr. Dunn but claiming that she had done so in self-defense.

Nevertheless, appellant argues that her substantial rights were implicated and that the fairness of judicial proceedings was affected because the admission of Dunn's statements prejudicially affected the outcome of the trial. For this proposition she relies on *Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968), asserting that the alleged error was not harmless because the admission of Dunn's statements forced her to testify, thereby tainting her testimony. *Harrison* does not support her argument. In *Harrison* the Supreme Court held that if a defendant decided to testify in order to overcome "the impact of confessions *illegally obtained* and hence improperly introduced, then his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible." *Id.* at 223, 88 S.Ct. 2008 (emphasis added). Thus the Court limited its holding to cases in which the government obtained evidence illegally, a situation not presented here.

This limitation of the Court's holding in *Harrison* is supported by subsequent Supreme Court cases which distinguish evidence as admissible, and not the fruit of any illegality, when it results from the independent act of a free will. *See Oregon v. Elstad*, 470 U.S. 298, 317, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) ("the Court has refused to find [on the basis of *Harrison*] that a defendant who confesses, after being falsely told that his codefendant has turned State's evidence, does so involuntarily") (citation omitted); *Pillsbury Co. v.*

*Conboy*, 459 U.S. 248, 279, 103 S.Ct. 608, 74 L.Ed.2d 430 (1983) (Blackmun, J., concurring) ("a statement following an illegal arrest must be suppressed as 'fruits' of the arrest unless it results from 'an intervening independent act of a free will,' and is 'sufficiently an act of free will to purge the primary taint of the unlawful invasion'") (quoting *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). We came to the same conclusion in *Patton v. United States*, 688 A.2d 408 (D.C.1997), in which we said:

> The principle which the Court sought to vindicate in *Harrison* ... namely, that where the government obtains evidence unlawfully, it shall not be permitted to avail itself of the fruits of that evidence—has no application to the present situation. We know of no case in which a court has excluded, under the doctrine of *Harrison* ... testimony said to have been induced by an incorrect evidentiary ruling.

*Id.* at 411. Given this post-*Harrison* case law, and given the very distinguishable facts of *Harrison* itself, we find no merit in appellant's *Harrison*-based argument.

It is evident from the record that appellant's decision to testify, while it may perhaps have been influenced by the admission of Mr. Dunn's hearsay statements, was clearly the product of her own free will. Further, it is reasonable to conclude that she would have chosen to testify anyhow, regardless of the admission of the statements to which she had objected. After the jury heard the testimony of the police officers about her own statements at the scene, she would certainly have felt a need to provide some defense or explanation for her actions. Accordingly, we hold that even if, *arguendo*, some error occurred, that error had no effect on appellant's substantial rights or on the fairness of judicial proceedings.

In an abundance of caution, however, we will address the Confrontation Clause issue to determine whether the trial court committed any error under *Crawford,* plain or otherwise.

## B. *Crawford*

In *Crawford* the Supreme Court held that the trial court had erred when it admitted tape-recorded statements made by the defendant's wife to police officers during the course of an interrogation after the defendant was arrested and after his wife had been read her *Miranda* rights. In so holding, the Court significantly changed the law regarding hearsay exceptions by "announc[ing] a *per se* rule: the Confrontation Clause bars the government from introducing testimonial statements at trial against a criminal defendant without calling the declarant to testify in person, unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant." *Thomas v. United States,* 914 A.2d 1, 11 (D.C.2006).

While the Court declared that the Confrontation Clause's "ultimate goal is to ensure reliability of evidence," it held that this was "a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford,* 541 U.S. at 61, 124 S.Ct. 1354. In arriving at this conclusion, the Court based its analysis on its reading of the historical circumstances which led to the adoption of the Confrontation Clause. *Id.* at 50, 124 S.Ct. 1354 ("the principal evil at

which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused"). Thus the Court overruled a portion of its earlier decision in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), which had held that the admission of hearsay statements bearing "adequate indicia of reliability" and "particularized guarantees of trustworthiness" did not violate the Confrontation Clause. *See id.* at 66, 100 S.Ct. 2531.[4]

The rule announced in *Crawford* applies only to "testimonial" statements. However, the Court in *Crawford* chose not to define just what it meant by "testimonial."[5] It made clear that it was referring to "a specific type of out-of-court statement," which it identified as a "solemn declaration or affirmation made for the purpose of establishing or proving some fact," "a formal statement to government officers," or the like. 541 U.S. at 51, 124 S.Ct. 1354 (citation omitted). But the Court went on to say that "[s]tatements taken by police officers in the course of interrogations are also testimonial under even a narrow standard," *id.* at 52, 124 S.Ct. 1354 and added in a footnote that it was "us[ing] the term 'interrogation' in its colloquial, rather than any technical legal sense." *Id.* at 52 n. 4, 124 S.Ct. 1354 (citing *Rhode Island v. Innis,* 446 U.S. 291, 300–301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)). This comment in turn raised a question about the precise meaning of "interrogation," which unfortunately the Court in *Crawford* did not answer either,

---

4. Significantly, the Court did not expressly overrule its decision in *White v. Illinois,* 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992). The Court noted that the *White* opinion was "arguably in tension with the rule requiring a prior opportunity for cross-examination when the proffered [hearsay] statement is testimonial," but nevertheless left *White*

undisturbed. *Crawford,* 541 U.S. at 58 n. 8, 124 S.Ct. 1354.

5. "We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Crawford,* 541 U.S. at 68, 124 S.Ct. 1354 (footnote omitted).

except to say that "one can imagine various definitions of 'interrogation,' and we need not select among them in this case." 541 U.S. at 53 n. 4, 124 S.Ct. 1354.

*Crawford* thus left many questions unanswered. Since then, however, the Court has provided some clarification in *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), in which it set out "to determine more precisely which police interrogations produce testimony." *Id.* at 2273. In the *Davis* opinion the Supreme Court considered two consolidated cases from different state courts: *Davis v. Washington*, No. 05–5224 involving a victim's statements made during a 911 call, and *Hammon v. Indiana*, No. 05–5705, involving a victim's statements made to police at the scene of the crime. In evaluating whether the statements at issue were testimonial, the Court provided the following standard:

> Statements are nontestimonial when made in the course of police interrogations under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis*, 126 S.Ct. at 2273–2274.[6] "Thus, the Supreme Court has defined 'testimonial' in functional rather than categorical terms. Broadly speaking, the Court has focused in *Crawford* and *Davis* on the primary anticipated or intended use of the statement, not on whether the statement qualifies as an exception to the rule against hearsay or falls into some other arbitrary testimonial category." *Thomas*, 914 A.2d at 14.

Despite the more precise definition of "testimonial" provided by the *Davis* Court, "the line between testimonial and nontestimonial statements will not always be clear," and "each victim statement thus must be assessed on its own terms and in its own context to determine on which side of the line it falls." *United States v. Arnold*, 486 F.3d 177, 189 (6th Cir.2007) (en banc). Nevertheless, the Court's application of the definition to the two cases that it considered in *Davis* provides a useful guide for our consideration in the case at bar.

In *Davis*, the first of the two cases addressed by the Court, a 911 operator received an emergency call, but before anyone spoke, the connection was broken. The operator then called the number back and, after a woman answered, began asking a series of questions. In response, the caller, Michelle McCottry, described a situation in which she was being physically attacked by her former boy friend, Adrian Davis.[7] Police arrested Davis, and in due course he was charged with violation of a

---

6. In a footnote the Court added:

> Our holding refers to interrogations … because the statements in the cases presently before us are the products of interrogations—which in some circumstances tend to generate testimonial responses. This is not to imply, however, that statements made in the absence of any interrogation are necessarily nontestimonial.

*Davis*, 126 S.Ct. at 2274 n. 1. Thus, while the purpose of any questioning is critical to the

Court's analysis, the nature of the declarant's statement remains a significant factor.

7. After Ms. McCottry answered, the 911 operator first asked, "What's going on?", to which McCottry responded, "He's jumpin' on me again." The operator followed with a series of questions, including "Are there any weapons?" and "Has he been drinking?", ultimately ascertaining the assailant's name. 126 S.Ct. at 2271.

"domestic no-contact order." *Id.* at 2271. At trial the state's only witnesses were the two police officers who responded to the 911 call. They described the injuries that they saw on Ms. McCottry, but neither officer could testify as to their cause. Ms. McCottry herself did not testify, and in her absence the trial court admitted a portion of the 911 call over Davis' objection. Ultimately, a jury found Davis guilty, and on appeal his conviction was affirmed by the Washington Court of Appeals and the Washington Supreme Court.

After granting Davis' petition for certiorari, the United States Supreme Court likewise affirmed, concluding that the statements made during the course of the 911 call were not "testimonial" and, therefore, that the admission of the 911 tape recording did not violate the Confrontation Clause. *Id.* at 2276–2277. The Court reasoned that "[a] 911 call . . . and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to establish or prove some past fact, but to describe current circumstances requiring police assistance." *Id.* at 2276. Distinguishing the call from the situation presented in *Crawford,* the Court noted four primary differences: (1) Ms. McCottry "was speaking about events *as they were actually happening,* rather than 'describ[ing] past events'"; (2) unlike the situation in *Crawford,* the emergency was ongoing and was "plainly a call for help against bona fide physical threat[s]"; (3) the nature of the inquiries "was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the

past"; and (4) whereas the declarant in *Crawford* was calm and in a safe environment, Ms. McCottry was "frantic" and "in an environment that was not tranquil, or even . . . safe." *Id.* at 2276–2277 (emphasis in original).

*Hammon,* the companion case to *Davis,* also involved a domestic disturbance, but the statements at issue were obtained by police at the scene rather than by a 911 operator. Upon arriving at a house to investigate a report of a domestic disturbance, police officers encountered Amy Hammon on the front porch. Although she appeared frightened, she told the officers that "nothing was the matter." *Id.* at 2272. After obtaining permission to enter the house, the police found her husband, Hershel Hammon, in the kitchen. While one officer stayed with the husband, another officer interviewed the wife in the living room, eventually obtaining from her a signed affidavit describing a violent argument during which her husband hit her and threw her to the ground. When Mrs. Hammon failed to appear at trial, the judge allowed the prosecutor to offer Mrs. Hammon's oral statements and the affidavit into evidence, and Mr. Hammon was convicted of domestic battery. The Indiana Court of Appeals and Indiana Supreme Court affirmed the conviction.

The Supreme Court reversed the conviction after concluding that Mrs. Hammon's statements were testimonial. The Court observed that when the police arrived, "[t]here was no emergency in progress"; the scene was calm, and there was "no immediate threat" to Mrs. Hammon. *Id.* at 2278.[8] In questioning her, the officer

---

8. Similarly, in *Drayton v. United States,* 877 A.2d 145 (D.C.2005), a pre-*Davis* case interpreting *Crawford,* this court held that a victim's statements were testimonial when they were obtained by the police after the scene was secured. The assailant was handcuffed inside a patrol car, and "[i]t [did] not appear that there was any ongoing danger to the officers or the community, nor [was] there any indication that [the police] were evaluating the scene to determine if anyone needed immediate medical attention." *Id.* at 151 (ci-

"was not seeking to determine ... 'what is happening,' but rather 'what happened.'" *Id.* Like the declarant in *Crawford,* she was "actively separated from the defendant"; her statements "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed," and the questioning "took place some time after the events described were over." Thus the court held that "[o]bjectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime...." *Id.*

The Court rejected the notion that "virtually any 'initial inquiries' at the crime scene will not be testimonial...." However, the Court explicitly stated that it was "not hold[ing] the opposite—that *no* questions at the scene will yield nontestimonial answers." *Id.* at 2279 (emphasis in original). In particular, the Court cited its prior observation that in domestic disputes "[o]fficers called to investigate ... need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim," *id.* (quoting *Hiibel v. Sixth Judicial District Court,* 542 U.S. 177, 186, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004), noting that "[s]uch exigencies may *often* mean that 'initial inquiries' produce nontestimonial statements." *Davis,* 126 S.Ct. at 2279) (emphasis in original). The Court concluded, however, that "in cases like this one, where Amy's statements were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation, the fact that they were given at an alleged crime scene and were 'initial inquiries' is immaterial." *Id.*

■ Appellant argues that Mr. Dunn's statements were admitted in violation of the Confrontation Clause because they were "testimonial" statements as that term is used in *Crawford.* They were testimonial, she maintains, because Mr. Dunn was "[a]n accuser who [made] a formal statement to government officers...." *Crawford,* 541 U.S. at 51, 124 S.Ct. 1354. *Amicus* argues, more broadly, that under *Crawford* any statement made to a police officer that another person has committed or is committing a crime is inherently "testimonial" because of its accusatory nature, regardless of the circumstances under which the statement was made. It is clear from *Davis,* however, that *Crawford* cannot be read in such absolute terms. We can see a difference, for example, between a statement uttered spontaneously to a police officer that is not made in response to any question,[9] or (perhaps more typically) a statement made in response to a very general question from a police officer such as "What happened?" or even "Who hurt you?", on the one hand, and a statement made in response to more detailed questioning of a witness or victim by an officer such as "What does he look like?" or "What kind of clothes was he wearing?" on the other hand.[10]

In the instant case, the circumstances surrounding Mr. Dunn's statements lie

tations omitted). Thus we concluded "that the officers ... were investigating a crime and fact-gathering in anticipation of potential future prosecution." *Id.*

9. This would include such statements as "That man over there just committed a crime." Cf. *Payne v. United States,* 111 U.S.App.D.C. 94, 95, 294 F.2d 723, 724 *cert. denied,* 368 U.S. 883, 82 S.Ct. 131, 7 L.Ed.2d

83 (1961) (a citizen approached a police officer on the street, said that someone had tried to "flimflam" him, pointed to a car emerging from a nearby parking lot, and said, "There's the man there"; warrantless arrest of the driver of the car upheld).

10. The latter type of statement is not before us in this case.

somewhere between *Davis* and *Hammon*.[11] The statements were not made as the crime occurred as in *Davis*, nor were they made after police had secured the scene as in *Hammon*. Nevertheless, in many respects the circumstances here lie closer to those in *Davis* than those in *Hammon*, and, when viewed objectively, they demonstrate to us that the primary purpose of Officer James' questions was to enable the police to respond to an ongoing emergency and not "to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 126 S.Ct. at 2274. We therefore hold that Jeffrey Dunn's statements were non-testimonial.

We say this for several reasons. First, it is evident that the police were facing "an ongoing emergency," *Davis*, 126 S.Ct. at 2273, and that Officer James' questions ("What happened?" and "Who did this to you?") were necessary to enable him to respond to that emergency. As in the case of a 911 operator receiving a call, the police here did not seek out Mr. Dunn; rather, they encountered him only because he flagged down a police car while trying to stop the "gaping wound on his face" from bleeding more profusely. A person in Mr. Dunn's situation, having been severely cut, might seek police attention for many reasons: to protect himself from the person who cut him, to seek medical treatment, or to make the police aware of a danger to others. Under the circumstances, any reasonable observer would conclude that Mr. Dunn was facing an ongoing emergency. *See Arnold*, 486 F.3d at 190 ("No reasonable officer could arrive at the scene while the victim was still 'screaming' and 'crying' about a recent threat to her life by an individual with a gun and who was likely still in the vicinity

without perceiving that an emergency still existed"); *United States v. Clemmons*, 461 F.3d 1057, 1060 (8th Cir.2006) (holding that police were facing an ongoing emergency when they questioned the victim after finding him "lying in front of a neighbor's house, suffering from multiple gunshot wounds").

■ Second, Mr. Dunn's statements were not made in the context of a structured, formal investigation intended "to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 126 S.Ct. at 2274. Under the circumstances Officer James' "immediate task" was not to investigate but "to find out what had caused the injuries so that he could decide what, if any, action was necessary to prevent further harm. Asking [the victim] 'what happened' was a normal and appropriate way to begin that task." *People v. Bradley*, 8 N.Y.3d 124, 127, 862 N.E.2d 79, 81, 830 N.Y.S.2d 1, 3 (2006). "The Confrontation Clause does not prohibit questioning when, as here, its purpose, viewed objectively, is to ascertain if there is an ongoing emergency." *Vinson v. State*, 221 S.W.3d 256, 265 (Tex.App. 2006) (citing *Davis*, 126 S.Ct. at 2276). Although any experienced police officer is undoubtedly aware of the possibility that any information he gleans may ultimately become evidence, building a prosecution is not the motivation for preliminary questions that are asked in response to an emergency situation. Like Ms. McCottry's statements in *Davis*, Mr. Dunn's were frantic, and the situation was uncertain. "To the extent [Officer James] made inquiries at all, they never strayed from asking questions clarifying the extent of

---

11. This can probably be said of quite a few cases. *See, e.g., People v. Bradley*, 8 N.Y.3d 124, 127, 862 N.E.2d 79, 81, 830 N.Y.S.2d 1, 3 (2006) ("The facts of this case are between those in *Davis* and *Hammon*: Dixon was neither describing a present event as it occurred, nor responding to detailed questioning in a calm, secure setting.").

the emergency and obtaining information necessary to resolve it." *Arnold,* 486 F.3d at 191. Viewed objectively, Officer James' questions were designed to find out whether there was any continuing danger and to respond to the situation with which he was confronted.[12] *See Head v. State,* 171 Md. App. 642, 660, 912 A.2d 1, 12 (2006) (concluding that a police officer's question "Who shot you?" was not intended "to establish or prove past events for possible use at trial"); *State v. Warsame,* 735 N.W.2d 684, 693 (Minn.2007) ("In order to [assess a party's injuries], officers must inevitably learn the circumstances by which the party was injured, and if the circumstances of the questions and answers objectively indicated that gaining such information is the primary purpose of the interrogation, then the party's statements are non-testimonial").

Additionally, the nature of the statements themselves supports the conclusion that they were not testimonial. As the trial court implicitly found when it admitted them as excited utterances, Mr. Dunn's exclamations were not really responsive to Officer James' questions. "While the fact that [the declarant's] . . . statement was unprompted and thus not in response to police interrogation does not by itself answer the inquiry, *Davis,* 126 S.Ct. at 2274 n. 1, this reality at least suggests that the statement was nontestimonial." *Arnold,* 486 F.3d at 190; *see Warsame,* 735 N.W.2d at 692 (finding an initial, volunteered statement non-testimonial when it

was made under "obvious distress" with no indication that the declarant had prosecution in mind). This holds true even with respect to Mr. Dunn's statement "There she is" when appellant returned to the scene.[13] *See Arnold,* 486 F.3d at 191 (holding that a victim's spontaneous exclamation, "That's him," when her assailant returned to the scene bore "even less resemblance to testimony" than the victim's earlier statements in response to police questioning). Combined with the fact that Mr. Dunn was visibly upset and bleeding when he said what he said, the non-responsiveness of the statements strongly suggests that Dunn "was not acting as a *witness;* [he] was not *testifying.* What [he] said was not 'a weaker substitute for live testimony' at trial." *Davis,* 126 S.Ct. at 2277 (citation omitted; emphasis in original). "While it may be the case that on-the-scene statements in response to officers' questions will be testimonial because the presence of the officers will alleviate the emergency, this is not one of those cases." *Arnold,* 486 F.3d at 190.

Because Mr. Dunn's statements were uttered in the course of an ongoing emergency, with the primary purpose of facilitating a response to that emergency, and because they were not the solemn and formal statements that one typically associates with testimony, we conclude that they were not "testimonial" statements as that term is used in *Crawford* and *Davis.* We therefore hold that the trial court's

---

12. We recognize that "a conversation that begins as an interrogation to determine the need for emergency assistance" may " 'evolve into testimonial statements' . . . once that purpose has been achieved" and the emergency has ended. *Davis,* 126 S.Ct. at 2276 (citation omitted). That is not what happened here, however; all of Mr. Dunn's statements admitted at trial were made before the officers were able to ascertain the extent of the emergency and secure the scene.

13. The officers at this point did not know the identity of the assailant, and the safety of Mr. Dunn, the officers, and the community at large remained paramount. "[N]othing that [Mr. Dunn] told them, and certainly nothing about the way [he] told it to them, would have allayed the concerns of a continuing threat to [Mr. Dunn] and the public safety, to say nothing of officer safety." *Arnold,* 486 F.3d at 190.

admission of these statements did not violate the Confrontation Clause.

## III

### A. Sufficiency of the Evidence

██ In considering appellant's claim that the evidence was insufficient to support her assault conviction, this court must view the evidence in the light most favorable to the government, keeping in mind the right of the trier of fact to assess credibility and to draw reasonable inferences from the evidence. *See, e.g., Nelson v. United States*, 601 A.2d 582, 593 (D.C. 1991) (citing cases). In a non-jury trial, this court will not reverse a conviction for insufficient evidence unless the appellant establishes that the trial court's factual findings were "plainly wrong" or "without evidence to support [them]." D.C.Code § 17–305(a) (2001); *see, e.g., Mihas v. United States*, 618 A.2d 197, 200 (D.C. 1992). We do not distinguish between direct and circumstantial evidence, and "the government is not required to negate every possible inference of innocence." *Jones v. United States*, 625 A.2d 281, 288 (D.C.1993).

██ To support a conviction of assault, the evidence must prove (1) a voluntary (2) act on the part of the defendant to harm another person, and (3) that at the time the defendant committed the act, he must have had the apparent ability to injure the person. *Williamson v. United States*, 445 A.2d 975, 978 (D.C.1982).

██ The evidence before the trial court included the testimony of two police officers who saw the bleeding laceration on the victim's face and heard him accuse appellant of cutting him. The officers also heard appellant make statements which appeared to be an attempt to explain her reasons for injuring Mr. Dunn. Moreover, appellant herself readily admitted that she cut Mr. Dunn when she swung her arm in his direction. Finally, the court made a determination that appellant's testimony regarding her intentions and her allegations of self-defense were not credible. Credibility determinations, of course, are exclusively entrusted to the trier of fact. Viewing the record in the light most favorable to the government, we are fully satisfied that the trial court's findings were not "plainly wrong" and that there was sufficient evidence to support appellant's conviction.

### B. The Site of the Offense

██ Appellant contends that the trial court lacked subject matter jurisdiction over the offense with which she was charged. Under D.C.Code § 11–923(b)(1) (2001), the Superior Court has jurisdiction of "any criminal case under any law applicable exclusively to the District of Columbia." *See Adair v. United States*, 391 A.2d 288 (D.C.1978). Lack of subject matter jurisdiction is not waivable and may be raised at any time. *Id.* at 290. Subject matter jurisdiction in a criminal case must always be proven beyond a reasonable doubt, *Mitchell v. United States*, 569 A.2d 177, 180–181 (D.C.1990), but it can be shown by indirect evidence and inferences reasonably drawn from that evidence. *See Weatherholz v. District of Columbia*, 109 A.2d 376, 377 (D.C.1954) ("We cannot say that the prosecution must fail because proof of venue was by indirect testimony rather than by specific words"). Further, the court can take judicial notice that the geographic locations mentioned in the testimony are in the District of Columbia. *Id.* Finally, and most importantly, there is a well-established presumption "that an offense charged was committed within the jurisdiction of the court in which the charge is filed unless the evidence affirmatively shows otherwise.... There is no such affirmative showing here." *Adair*, 391 A.2d at 290 (citation omitted).

Appellant did not present any evidence to rebut the presumption that the offense took place in the District of Columbia. Appellant herself admitted that the offense occurred outside her place of employment at "Union Plaza" and that she was walking with Mr. Dunn on "Florida Avenue" when it occurred. Rather, she rests her argument on the failure of any government witness to state explicitly that the corner of Florida Avenue and Bates Street, where the assault occurred, is located in the District of Columbia. Given that Officer Jefferson testified that he worked at "the Third District, Metropolitan Police Department, Washington, D.C.," and that he responded to Officer James' call for assistance within one minute while on patrol, the court could appropriately take judicial notice that the location of the offense was and is within the District of Columbia. See Weatherholz, 109 A.2d at 377.[14]

### C. The Trial Judge's Questioning of Witnesses

█ Finally, appellant argues that the trial court took an inappropriately inquisitorial role in her trial and thereby denied her due process of law. Defense counsel, however, did not object to any of the court's questions at the time they were asked. Therefore, we review appellant's present claim that the trial court took on the role of prosecutor and exceeded its powers for plain error only. Handon v. United States, 651 A.2d 814, 816 (D.C. 1994); Golsun v. United States, 592 A.2d 1054, 1060 (D.C.1991). We find no plain error; indeed, we find no error at all.

█ Courts are permitted to question witnesses "in the aid of truth and the furtherance of justice." Womack v. Unit-

ed States, 350 A.2d 381, 382–383 (D.C. 1976); see Holmes v. United States, 615 A.2d 555, 557–558 (D.C.1992) (trial judge may ask questions to determine whether defendant could properly raise a particular defense); Johnson v. United States, 613 A.2d 888, 895–896 (D.C.1992) (trial judge may ask questions to clarify testimony); United States v. Spencer, 306 U.S.App. D.C. 399, 403–404, 25 F.3d 1105, 1109–1110 (1994) (trial judge may ask questions to establish background details); Roberts v. United States, 109 U.S.App.D.C. 75, 76–77, 284 F.2d 209, 210–211 (1960) (trial judge may ask questions "to test the accuracy of the witness's memory ... and thus to aid the jury in its determination of the witness's reliability and credibility"). Of course, during a non-jury trial such as this one, a judge's questioning is less problematic because there is no risk of biasing a jury. See United States v. Roach, 323 U.S.App.D.C. 448, 455, 108 F.3d 1477, 1484, cert. denied, 522 U.S. 983, 118 S.Ct. 446 (1997), vacated in part on other grounds, 329 U.S.App.D.C. 54, 136 F.3d 794 (1998).

Appellant bases her challenge to the trial court's questioning of witnesses on two cases, In re A.R., 679 A.2d 470 (D.C.1996), and Davis v. United States, 567 A.2d 36 (D.C.1989). These cases are inapposite because in each case the central issue was whether a trial judge could or should conduct an investigation outside the courtroom to develop the facts. In A.R., a termination of parental rights case, we affirmed a judgment against the father, rejecting his contention that the trial judge had erred "by declining to interview [the child] in chambers or to attempt to expand in some other way the evidentiary record

---

14. Appellant also asserts that the trial court erred by failing to make an express finding that the assault occurred in the District of Columbia. This assertion is incorrect on the face of the record; the court found that "the defendant and the victim met at the Ice House in the unit block of Florida Avenue, a location [at] which the victim, Mr. Dunn, works."

presented to her by the parties." *See* 679 A.2d at 475–476. In *Davis* we reversed convictions of unauthorized use of a vehicle and assault on a police officer because the trial judge had "initiated an investigation to find out whether appellant had ever had a driver's license," 567 A.2d at 39, noting that "under our system of laws, a judge is not an investigator. . . ." *Id.* at 42. Nothing remotely comparable happened in this case.

In the case before us, the trial court's questions of Officer James properly sought information to develop more fully a line of questioning already initiated by the prosecution. In one instance, the court simply inquired about what exactly was said to Officer James ("What is the first thing that the individual you've just described, whom you have not yet named, said to you? . . . Was there any other conversation?"). In another, the court attempted to avoid a hearsay issue by saying to counsel, "Could you ask a more specific question so that you're not potentially eliciting hearsay?" On a third occasion, the court questioned Officer James to clarify his testimony ("I know you testified to this twice, but I just want to make sure I got it right. Tell me again what the defendant said."). All of these questions, which are typical of others that were asked by the court, fit squarely into those categories of questions that are well established as acceptable questions from trial judges, especially in non-jury trials. We find no error whatsoever in the judge's questioning of the witnesses.

### IV

For the foregoing reasons, appellant's conviction is

*Affirmed.*